IN ERROR.

ALBANY,
Nov. 1822.

PRINCE
v.
HAZLETON.

*Sept. 6th.*

---

BENJAMIN PRINCE, *Public Administrator in the city of New-York,* Appellant,
*against*
GEORGE HAZLETON, and MARY, his wife, Respondents.

A *nuncupa-tive* will is not good, unless it be made when the testator is in *extremis,* or overtaken by sudden and violent sickness, and has not time to make a written will. By the words " last sickness," in the purview of the statute, (sess. 36. ch. 31. sec. 14. 1 *N. R. L.* 303—307.) is to be understood the last extremity.

THIS cause came before this Court, on an appeal from a decree of the Court of Probates, in the matter of granting

IN ERROR.
........

ALBANY,
Nov. 1822.

PRINCE
v.
HAZLETON.

administration on the estate of *William Jones*, of the city of *New-York*, deceased. The appellant, who is the *public administrator* of the city of *New-York*, appointed pursuant to the statute, (sess. 38. ch. 157.) sued out a citation to the widow and next of kin of *William Jones*, deceased, to show cause before *Sylvanus Miller*, Esquire, Surrogate of the city of *New-York*, on the 17th of *May*, 1820, why administration should not be granted to the appellant, according to the statute. *Mary Hazleton*, one of the respondents, appeared before the Surrogate, and offered for probate a *nuncupative will*, with the depositions of four witnesses thereto, taken, *ex parte*, the 4th of *May*, 1820, before a commissioner, in proof of such will, which was as follows : " The last will and testament of *William Jones*, late of the city of *New-York*, gentleman, by word of mouth, made and declared by him, on or about the eleventh day of *April* last past, in presence of us, the undersigned, *Jacob S. Arden*, *William Lee*, *George Waters*, and *Ellen Taylor*, who have hereunto subscribed our names as witnesses to such last will and testament : ' I now say, as I have repeatedly said before, that I leave all the property I am possessed of to *Mary Hazleton* ; I do this in consequence of the good treatment and kind attention I have received from her during my sickness.—She is worthy of it.—No other person shall inherit my property.—I wish you all in the room to take notice of this.' In witness whereof, we have hereunto set our hands, this seventeenth day of *May*, in the year of our Lord, one thousand eight hundred and twenty." Signed by the four persons above named. It appeared, that the supposed testator died on the 17th of *April*, 1820.

The four witnesses above named, and five other witnesses, were examined before the Surrogate, in support of the will, and nine witnesses deposed as to the character of *William Lee*, one of the witnesses to the will. Fifteen witnesses were examined before the Surrogate against the will so offered, and three witnesses deposed against the character of *William Lee*. The Surrogate decided, that the will was not sustained ; and on the 17th of *October*, 1820, pronounced the following sentence : " The Surrogate of the city and county of *New-York*, having heard counsel in the above

matter, and maturely considered the same, and having, also, examined the evidence adduced in the premises, after due examination of the law, and the testimony applicable and relevant thereto, doth order, sentence, adjudge, and decree, that the nuncupative will of the said deceased cannot be admitted to probate, and that the application, therefore, be dismissed; and it is further ordered, sentenced, adjudged, and decreed, that letters of administration of the goods, chattels, and credits, which were of the said deceased, be granted and issued, according to law, as in cases of intestates."

There was an appeal from this sentence to the Court of Probates, at *Albany,* by the present respondents. The Judge of the Court of Probates, having heard the proceedings and proofs returned by the Surrogate read, and the arguments of the counsel in the cause, on the 19th *June,* 1821, pronounced the following decree : " It is ordered, adjudged, and decreed, and this Court doth order, adjudge, and decree, that the decree of the said Surrogate, in the said matter, be reversed : and it is further ordered, adjudged, and decreed, that the nuncupative will of the said *William Jones,* deceased, having been duly proven, be admitted to probate; and that letters of administration, with the said will annexed, be issued thereon, out of this Court, to *Mary Hazleton,* the legatee in the said will named." From this decree, the public administrator of the city of *New-York,* appealed to this Court.

As this Court reversed the decree of the Court of Probates, as well on the *law,* as on the facts of the case, it is deemed unnecessary to state the voluminous depositions read in the cause, all of which were set forth, at length, in the printed case, as the leading facts are mentioned in the opinions of the members of this Court.

The cause was argued by *Hoffman,* and *T. A. Emmet,* for the appellant; and by *Henry,* and *Van Buren,* for the respondents. In their arguments, which continued during four days, the counsel went into a very minute and critical examination of the depositions, and the character of the witnesses, and weight of evidence, on both sides; but it will

be sufficient here, briefly to state the points and authori-<br>
ties as to the question of law arising in the cause.

*For the appellant,* it was contended, that the will had not<br>
been proved to be a good *nuncupative* will, within the mean-<br>
ing and intent of the statute, (sess. 36. ch. 23. s. 14. 1 *N. R.*<br>
*L.* 364—367.) which declares, that no such will shall be<br>
good, unless " made in the time of the last sickness of the<br>
deceased." This statute was passed to remedy the great<br>
abuses which existed in practice, and it has added many<br>
restrictions. Such a will, therefore, must not only have all<br>
the requisites existing at common law, but all those prescrib-<br>
ed by the statute, concerning which *Blackstone* (2 *Bl. Com.*<br>
500.) observes, " that the legislature has provided against<br>
frauds in setting up nuncupative wills, by so numerous a<br>
train of requisites, that the thing has fallen into disuse ; and<br>
is hardly ever heard of, but in the only instance where fa-<br>
vour ought to be shown to it, when the *testator is surprised*<br>
*by sudden and violent sickness.*" *Perkins,* (*Profitable Book,*<br>
or *Treatise of the Laws,* &c. first printed in 1538—p. 279. sec.<br>
476.) says, that such a will must be made when the testator lies<br>
languishing, *for fear of sudden death,* and dare not stay to<br>
have his testament written. (*Swinburne on Wills,* part 1. s.<br>
12. 1 *Inst.* 24. *Plowden,* 57. 7 *Bac. Abr.* by *Gwillim,*<br>
305. tit. *Wills,* D. 6 *Wood's Convey.* 574, 575. *Swin-*<br>
*burne,* 517, 518. part 7. s. 18. 1 *Phillimore Rep.* 49. 88,<br>
89. 50. 57. 102. 19.) Such a will must be made while the<br>
party is in *extremis :* and all the witnesses must agree, when<br>
they reduce the will to writing, in making the testator speak<br>
the same words. It is not sufficient to state the substance<br>
or effect of them.

*For the respondents,* it was contended, that it was not es-<br>
sential to a good nuncupative will, that it should be made<br>
while the testator was in *extremis.* That the words " last<br>
sickness," in the statute, do not require such a construction.<br>
*Perkins* and *Swinburne,* who wrote before the statute of 29<br>
*Charles* II. ch. 3. from which our statute has been taken,<br>
merely describe the mode or circumstances in which such<br>
wills are ordinarily made ; they do not say that the law re-

IN ERROR.
.......

ALBANY,
Nov. 1822.

PRINCE
v.
HAZLETON.

quires that those precise circumstances should exist in all cases, in order to render a nuncupative will valid. The common law authorities do not lay it down as an indispensable requisite, that the party should be sick, much less that he should be in *extremis*. The *Roman* law, as to testaments in regard to *personal* property, was early adopted in *England*. (*Harwood* v. *Goodright, Cowper*, 86. 90. 1 *Phillimore Rep.* 430.) *Swinburne* (87. part 1. s. 12.) says, "a *nuncupative* testament is, when the testator, without any writing, doth declare his will before a sufficient number of witnesses;" and he afterwards observes, (p. 88.) that "this kind of testament is commonly made when the testator is very sick," &c. but he does not appear to consider the sickness of the testator, at all essential; nor does he make it a part of his definition of a nuncupative will. The civil law (*Harris's Just. Inst.* lib. 2. tit. 10. s. 14.) only required that a testament without writing should be made in the presence of *seven* witnesses ; and from the note of Dr. *Harris*, it is evident that the only material alteration made by the statute in the common law of England, is by reducing the number of witnesses from *seven* to *three*. At common law, one witness, with attending circumstances, would have been sufficient ; and it was the laxity of the rule, in this respect, that gave rise to the statute. Soldiers and seamen, while in actual service, may make nuncupative wills ; but it will not be pretended that they must be in *extremis*. *Burns* (*Eccles. Law*, vol. 4. p. 107.) gives the same definition of a nuncupative will as *Swinburne*. He says, "a nuncupative testament is, when the testator, without any writing, doth declare his will, before a sufficient number of witnesses." He says nothing about the party being in *extremis*, or even sick ; but proceeds to show what alterations had been made by the statute. *Wood* (*Inst.* 334.) gives the same definition. *Hargrave* (*Co. Litt.* 111 *a.*note 3.) considers the statute as prescribing a new rule, when it requires the testator to be in his *last sickness*. But can these words be tortured to mean that he should be in *extremis* ? It is true, there are very few cases to be found applicable to this question. The case of Dr. *Shallmer's* will, is stated by *Burns*, (ubi supra,) and in *Equity Cases Abridged*, (tit. *Wills*, B. pl. 2. p. 404.) It was decided in 1704, after

the statute ; and it is fairly to be collected, from what is said by the Lord Chancellor, that our construction of the statute is correct. The doctrine of a continuance of intention, as stated from *Phillimore*, relates to *written* wills left unexecuted. A change or discontinuance of intention, is not to be inferred from mere silence, or inaction. There must be something positive and express, to destroy the idea of a continuance of intention of the testator, until his death. There is no proof that any means were made use of to prevent the testator from altering his will after it was declared. (3 *Swinburne*, 997. 999. part 7. s. 18.) If the testimony of *Ellen Taylor* is laid out of the case, the requisite number of witnesses will remain. The slight discrepancy between the witnesses, while testifying to the same facts, strengthens rather than weakens the force of the evidence. (*Paley's Ev. Christ.* 216.)

THE CHANCELLOR. The question to be discussed is, whether the nuncupative will of *William Jones*, as stated to have been made on the 11th of *April*, 1820, can be admitted to probate, as being valid in law. It becomes a complicated question, under the circumstances, and involves in the inquiry matter of fact, mixed with matter of law. I shall consider it to be my duty to speak frankly and freely on the whole subject of the case, but, at the same time, with a sincere respect for the character of the Court whose opinion is now under review, and from which I shall be obliged very greatly to dissent.

*William Jones* was an *Irishman* by birth, and a religious catholic by profession. He was born in the county of *Dublin*, in *Ireland*, and received a school education about thirty years before his death, and which carries us back to the year 1790. He had then living, parents, brothers and sisters, and he was the youngest of the family. He was apprenticed to a house-carpenter in the city of *Dublin*, and served a regular apprenticeship of seven years. When this service expired, he worked as a journeyman, for nine or twelve months, and then emigrated to the *United States*. This brings us, in the history of his life, to the year 1798, and perhaps that fact may enable us to give some probable solution of the only circumstance that seems (if we except

IN ERROR.
........
ALBANY,
Nov. 1822.

PRINCE
v.
HAZLETON.

the will) to cast any shade over the memory of this man; I allude to the change of his paternal name, *O'Connor*, for that of *Jones*. It does not appear, precisely, when he changed his name, but I refer it back to that period, as the probable time, and presume that he and his family were more or less implicated in the peril of the rebellion, which broke out in *Ireland* in 1798, in consequence of an ill-fated attempt to effect a revolution in that kingdom. It is probable, that he may have emigrated, for safety; and, for greater safety, laid down the name of *O'Connor*, which was then memorable in the *Irish* annals, on the side of the unfortunate. But, be this conjecture as it may, we find him first at *New-York*, then for two years at *Savannah*, then living, for 12 or 14 years, in the island of *Cuba*, and learning the *Spanish* language, and where he probably made his fortune. He is next traced, on his return to the *United States*, to the cities of *Baltimore, Philadelphia,* and *New-York;* and in all of them, he seems to have had business, pecuniary concerns, and friends.

These are the few and imperfect sketches of his biography to be selected from the case, before we find him rich in the fruits of his enterprise, but sick with a disease of the liver, at the boarding-house of Mrs. *Fox*, in *Cherry-street*, in *New-York*, the latter end of *March*, 1820.

*Jones*, while at the house of Mrs. *Fox*, claimed to be worth, altogether, 65,000 dollars, in property, existing in *New-York, Philadelphia, Baltimore,* and the island of *Cuba;* and to show that this claim had pretty fair pretensions to truth, there was actually found at his lodgings, at his death, bank books, showing deposits to his credit, in one or more banks of *New-York*, to between thirteen and fourteen thousand dollars.

He had been sick at Mrs. *Fox's* about five weeks, when he is said to have made the will now under consideration. During that time, he had one *Ellen Taylor*, a coloured woman, for his hired nurse; and there was a Mrs. *Hazleton*, who had rooms, and boarded in the same house, who also acted as his nurse.

Whether *Jones* ever saw or heard of Mrs. *H.* before he came to board at Mrs. *Fox's*, does not appear, nor have we

in the case, any distinct lineaments of the character which Mrs. *H.* sustains, or the business or purpose of her life. She rented the two front rooms in the boarding-house, and yet, her brother says, she followed no kind of business. She has had two husbands, and her present one is said to be a seafaring man, by one of her witnesses, and, another of them says, that he had been voyages at sea, and had been on the gaol limits, and was then following his trade of a whitesmith at *Savannah.* Why she lives in this detached situation, without a family of her own, and a husband to live with and provide for her, as is quite common with married persons, must be left to conjecture. She was able, all at once, and, as it would seem, without any adequate cause, and without any remarkable display of goodness, or even of attention, to gain a wonderful ascendency over the affections of this sick man. If her story be true, and the will genuine, she obliterated from *Jones's* breast the sense of friendship, the charities of religion, the deep-rooted traces of national affection, every tender recollection of the ties of blood, of his natal soil, of the school-fellows of his youth, of father and mother, brother and sister, relative and friend. He was persuaded at one nod, to pour the accumulated treasures of his varied life, into the lap of this mysterious woman—the acquaintance of a day!

The will, as certified by the four witnesses, is in these words : "I now say, as I have repeatedly said before, that I leave all the property I am possessed of to *Mary Hazleton.* I do this in consequence of the good treatment and kind attentions I have received from her during my sickness. She is worthy of it. No other person shall inherit my property. I wish you all in the room to take notice of this."

This will carries marks of *fraud on its very face.* Let us examine it attentively. This sweeping donation is made, for what? *For good treatment and kind attentions received from her during his sickness.* The sickness had lasted only five weeks, and it was not so bad but that he was able occasionally to ride out. No person apprehended any immediate danger. He had a hired nurse, a coloured woman, who was, by him, totally forgotten. What

IN ERROR.

ALBANY, Nov. 1822.

PRINCE v. HAZLETON.

IN ERROR.
.......
ALBANY,
Nov. 1822.

PRINCE
v.
HAZLETON.

could this other woman have possibly done, in the course of five weeks, to awaken, in any rational mind, a sense of such enormous obligation, or to call forth such stupendous remuneration? I am forcibly struck with the folly and falsehood of the motive assigned. But the will goes on, and adds, *She is worthy of it;* and where does her great merit appear, and from what circumstance does she entitle herself to this extravagant eulogy? The very declaration, that she was worthy to possess all his estate, proves, that *Jones* must have been insane, or that the whole is a base fabrication. The will goes on further, and says, *No other person shall inherit my property.* And why these words of special exclusion of the rest of the world? They seem to imply a heartlessness and misanthropy, very unnatural and very improbable for any man to express, in the contemplation of death, and who was in the enjoyment of the comforts and the smiles of fortune; and especially for a native born *Irishman*, who was in the midst of his emigrant countrymen, and could not but have heard and felt the claims of religion, of charity, of the widow and the orphan. He then adds, *I wish you all to take notice of this;*—a speech which looks so much like contrivance, that it does, of itself, throw a suspicion over the whole piece. This man must have been previously told, that the statute required, that in making a nuncupative will, the testator must *bid the persons present, to bear witness that such was his will.* It was made in the middle of the day, when he was quite comfortable, and far from the apprehension of death, and, in this respect, with all punctilious and technical adherence to forms. It had the requisite number of witnesses, and the address to the by-standers. *Jones* must have deliberately determined on a nuncupative, instead of a written will, and have previously known and studied all the circumstances that were requisite to make it valid, or else, this will has been since got up for him, like a puppet show, by the art and cunning of some juggler behind the scene.

[His honour here went minutely, and at large, into the examination of the testimony in the cause, and particularly of that of the four witnesses to the will, and observed, that from the nature, the improbabilities, the inconsistencies, and

IN ERROR.
●●●●●●●
ALBANY,
Nov. 1822.

PRINCE
v.
HAZLETON.

the absurdity of the story, and the character and conduct of the witnesses, he drew the conclusion, that the testimony of those witnesses was utterly unworthy of credit, and that the will was evidently the production of fraud and perjury. After having disposed of the question of fact, his honour proceeded as follows :]

But, if we were to admit, against the truth of the fact, that the will of the 11th of *April* was actually and fairly made, according to the certificate of the four witnesses, it would then become a question of law whether it amounted to a valid nuncupative will.

A nuncupative will is defined by *Perkins*, (s. 476.) in his book, which was published under *Henry* VIII., to be properly when the testator " *lieth languishing for fear of sudden death, dareth not to stay the writing of his testament,* and, therefore, he prayeth his curate, and others, his neighbours, to bear witness of his last will, and declareth by word what his last will is." So, again, in *Swinburne*, (p. 32.) whose treatise was published in the time of King *James* I., it is said, that this kind of testament is commonly made when the testator *is now very sick, weak, and past all hope of recovery.* I do not infer from these passages, that unwritten wills were always bad at common law, unless made in a case of extremity, when death was just overtaking the testator. In ignorant ages, there was no other way of making a will but by words or signs; reading was so rare an accomplishment in the earliest ages of the common law, that it conferred great privileges, and the person who possessed it was entitled, under the name of benefit of clergy, to an exemption from civil punishment. But these ancient writers mean to be, understood, that in the ages of *Henry* VIII., *Elizabeth*, and *James*, letters had become so generally cultivated, and reading and writing so widely diffused, that nuncupative wills were *properly*, according to *Perkins*, and *commonly*, according to *Swinburne*, confined to extreme cases, and to be justified only upon the plea of necessity. And this has been the uniform language of the *English* law writers from that time down to this day, so that it has become the acknowledged doctrine, that a nuncupative will is only to be tolerated when made *in extremis.* Thus, in *Ba-*

IN ERROR.
.......
ALBANY,
Nov. 1822.

PRINCE
v.
HAZLETON.

*con's Abridgment,* which was first published in 1736, and compiled chiefly from materials left by Lord Ch. B. *Gilbert,* a nuncupative will is taken from *Perkins,* and defined to be when a man is *sick,* and for *fear that death, or want of memory or speech, should surprise him, that he should be prevented, if he stayed the writing of his testament, desires his neighbours and friends to bear witness of his will,* and declares the same presently before them. (7 *Bac. Abr.* by *Gwillim,* 305.) The same definition is adopted by *Wood,* in his laborious work on conveyancing ; (vol. 6. 574.) and in *Blackstone's Commentaries,* (vol. 2. 500, 501.) a nuncupative will is defined to be one declared by the testator *in extremis* before a sufficient number of witnesses. After reciting the substance of the provisions of the statute of 29 *Charles* II., (and which we have re-enacted,) he adds, " thus has the legislature provided against any frauds in setting up nuncupative wills, by so numerous a train of requisites, that the *thing itself has fallen into disuse, and hardly ever heard of, but in the only instance where favour ought to be shown to it, when the testator is surprised by sudden and violent sickness."* And while I am citing so many *English* definitions of nuncupative wills, it cannot be thought useless, and will not be deemed unacceptable, that I should also refer to the very respectable opinion of the late Chief Justice of *Connecticut,* who declares, when speaking of nuncupative wills as understood in the *English* law, that they are allowed only in cases where, in extreme and dangerous sickness, the testator has neither time nor opportunity to make a written will. (1 *Swift's System,* 420.)

It appears to me, that these various writers must be satisfactory to every one, as to the true sense and meaning of a nuncupative will under the *English* law. It is not easy to recur to more accurate sources. The probate of wills being in *England* a matter of ecclesiastical cognizance, cases on that point rarely appear in the reports of decisions in the Courts of common law. I have, however, been able to select two or three cases of nuncupative wills, which I shall submit to the consideration of the Court.

*Coles* v. *Mordaunt,* (4 *Vesey,* 196. note.) was the case of a nuncupative will, in the 28th year of *Charles* II., and

IN ERROR.
........
ALBANY,
Nov. 1822.

PRINCE
v.
HAZLETON.

it is well worthy of notice, that this was only one year before the 29 *Charles* II., when the statute relating to nuncupative wills was passed, and is said to be the principal case which gave rise to that statute. The case was this: Mr. *Cole*, at a very advanced age, married a young woman, who, during his life, did not conduct herself with propriety. After his death, she set up a nuncupative will, said to have been made *in extremis*, (for these are the words used in the report of the case,) and by which the whole estate was given to her, in opposition to a written will made three years before, giving 3,000 pounds to charitable uses. The nuncupative will was proved by nine witnesses, but the Court of Probates rejected the will, and on appeal to the Delegates, a trial was had at the bar of the K. B., and it appeared, that most of the witnesses for the nuncupative will were perjured, and Mrs. *Cole* herself was guilty of subornation of perjury. It was upon the occasion of this shocking and foul conspiracy, that Lord Ch. *Nottingham* said, " he hoped to see one day a law, that no written will should ever be revoked but by writing." He was gratified in seeing such a law the succeeding year; and I will venture most respectfully to add, that if this nuncupative will be established, I should, also, hope to see one day a law, that no nuncupative will should be valid in any case.

The case I have cited contains a monitory lesson; and it very much resembles, in its principal features, the one before us.

In *Philips* v. *The Parish of St. Clements, Danes*, (1 *Eq. Cas. Abr.* 404. pl. 2.) which was cited upon the argument, and arose in 1704, one Doctor *Shallmer*, by will, in writing, gave 200 pounds to the parish, and *Prew, a reader in the church, coming to pray with him,* he said, he gave 200 pounds more towards building the church, and died on the next day. This was a case of a nuncupative will, which only failed for want of three witnesses; but this testator was evidently *in extremis*. The particulars are not stated, except only that an officer of the church came to pray with him, and that he died the succeeding day; but those two circumstances well warrant the inference.

There is a very close analogy between these nuncupative

IN ERROR.
•••••••
ALBANY,
Nov 1822.

PRINCE
v.
HAZLETON.

wills, and a gift upon the death bed, or a *donatio causa mortis ;* and these gifts are defined by the Court of Chancery in *Hedges* v. *Hedges,* (*Prec. in Ch.* 269. *Gilbert's Eq. Rep.* 12.) in the very terms of a proper nuncupative will. A *donatio causa mortis,* is where a man lies *in extremity,* or being *surprised* by sickness, and not having an *opportunity of making his will,* but lest he should die before he could make it, gives away personal property with his own hands. If he dies, it operates as a legacy. If he recovers, the property reverts to him.

Upon the strength of so much authority, I feel myself warranted in concluding, that a nuncupative will is not good, unless it be made by a testator when he is *in extremis,* or overtaken by sudden and violent sickness, and has not time or opportunity to make a written will. The statute of *Charles* II. so often referred to, and which we have literally adopted, requires a nuncupative will to be made by a testator in his *last sickness,* and in his own dwelling-house, or where he had been previously resident for ten days, unless surprised by sickness on a journey, or from home. The last sickness, in the purview of the statute, has been always understood (for so I infer from the cases cited) to apply to the last extremity mentioned in the books, and it never was meant to uphold these wills, made when there was no immediate apprehension of death, and no inability to reduce the will to writing. A case of necessity is the only case, according to *Blackstone,* in which any favour ought to be shown them. If they are alleged to have been made in a case unaccompanied with necessity, the presumption of fraud attaches to the very allegation. Let us suppose, by way of illustration, the instance of a person gradually declining under the operation of some slow paced disease, as the affection of the liver, or the consumption of the lungs, or the dropsy, or the cancer. The patient is, himself, we will suppose, under no immediate apprehension of death, nor is any such alarm excited in others. He is comfortably seated in his chamber, in the midst of a populous city, and with ample means to command every kind of assistance. He has had a fair common education, and knows well how to read and write. He has been a man of good understand-

ing, habits of business, and of successful enterprise, and has accumulated a fortune. He is well versed in the knowledge, and in the affairs of mankind. He has pen, ink, and paper at hand, with an adroit physician at his elbow, and a favourite friend at his side, on whom he wishes to bestow his fortune. He is in the middle of life, with his intellects perfectly sound; he proposes, or it is proposed to him, to make his will. Would such a man, in such a case, ever dream of making a nuncupative will? Would any honest or discreet friend ever advise him to it? If that should be his wish, or if that should be the suggestion of others, would the law tolerate such an indulgence, under the notion that he was in his last sickness? Surely the good sense of the law, as the books explain that law, and the cautious and jealous provisions of the statute of frauds, never intended a nuncupative will for such an occasion. The law wisely discriminates between written and unwritten wills, and permits the latter only in cases of urgent necessity. To abolish that distinction, would be to abolish protection to property, to encourage frauds and perjuries, and to throw us back upon the usages of the unlettered ages.

If nuncupative wills can be permitted at all, in the cases of chronic disorders, which make silent and slow, but sure and fatal approaches, it is only in the very last stage and extremity of them. In no other period can such a disorder be deemed, within any reasonable construction of the statute of frauds, a man's *last sickness.* Such diseases continue for months, and sometimes for years. In one of Captain *Cook's* voyages, he states, that he lost his first lieutenant, Mr. *Hicks,* near the conclusion of the voyage of three years, and almost within sight of the *English* coast. But, he adds, that as his disease was the consumption, and as it existed when he left *England,* it might be truly said, that he was dying during the whole voyage. What would the law call that man's last sickness? Not the whole voyage surely, and, probably, it would be narrowed down to the last day, and to the last hour of his existence. We must give a reasonable interpretation to the statute, in reference to the mischief, and to the remedy. We cannot safely apply a man's last sickness to the whole continuance of a pro-

IN ERROR.
•••••••

ALBANY,
Nov. 1822.

PRINCE
v.
HAZLETON.

tracted disease, without giving to the statute an absurd construction. I do, therefore, most confidently insist, that *Jones* was not in this last sickness on the 11th of *April*, within the sense, or within the policy of the statute, and that he was not then entitled to make a nuncupative will.

There is one other consideration that imparts to this subject of nuncupative wills, a momentous character, and ought to incline us to give to them as little countenance as possible. As soon as a nuncupative will is made, it becomes the interest of the legatee that the party's sickness should prove to be his *last* sickness; for if he recovers, the will, of course, falls to the ground. Not so with a written will. That remains good until revoked, and it cannot be revoked but by writing. Let us, for one moment, pause over this consequence of nuncupative wills, and observe with what a deleterious influence they must suddenly act upon the heart, and what a powerful appeal they at once make to the selfish and dark passions of the human mind. The title of the legatee depends altogether upon the precipitate death of the testator. Every day that his life is prolonged, more and more impairs the character of the will, and it vanishes if he becomes convalescent. Suppose the testator was understood to possess a large amount of cash in hand, and that he gives it all, by a nuncupative will, to a stranger, to whom the law would not have given it. Suppose that stranger to be his physician, or as, in the present case, his nurse, what hold has the testator on her fidelity, her kindness, or her integrity? Her interest and her wishes, (if indeed her wishes procured the will,) must be to destroy, and not to heal her benefactor. The legacy operates as a bounty upon his death. One cannot contemplate a nuncupative will under this aspect, without sensations of horror. Well might such a man exclaim, as *Jones* is said to have done, repeatedly, " *My life depends upon that woman.*"

I am accordingly of opinion, both upon the law, and upon the fact, that the decree of the Court of Probates, directing the nuncupative will of *William Jones* to be admitted to probate, was erroneous, and ought to be reversed; and that the decree of the Surrogate of the city and county of *New-*

*York,* of the 17th *October,* 1820, directing the application to admit the said nuncupative will to probate to be dismissed, and that letters of administration, of the goods, chattels, and credits, which were of *William Jones,* deceased, be granted and issued, according to law, as in cases of intestates, be confirmed.

IN ERROR.
........
ALBANY,
Nov. 1822.
PRINCE
v.
HAZLETON.

SPENCER, Ch. J. said, that he concurred in opinion with the Chancellor, that the decree of the Court of Probates ought to be reversed, on the ground, that the alleged nuncupative will was not made while the testator was *in extremis;* and because it appeared, from all the evidence in the case, that when the alleged will was made, he did not think himself, nor did any other person think him to be in any immediate danger of dying; and because there was ample opportunity to make a will in writing, had the supposed testator been so disposed.

PLATT, J. said, that he fully concurred in the opinion of the Chancellor, both on the law and the fact.

WOODWORTH, J. This case comes before the Court on an appeal from the decree of the Court of Probates, by which it is adjudged, that the nuncupative will of *William Jones,* deceased, having been duly proved, be admitted to probate, and that letters of administration, with the will annexed, be issued thereon.

I will examine this cause in the following order :

1. What are the facts necessary to constitute a valid nuncupative will ?

2. Does the testimony satisfactorily prove the making of such will ?

The act concerning wills, declares, " *that no nuncupative will shall be good, where the estate thereby bequeathed shall exceed the value of 75 dollars, unless the same be proved by the oaths of three witnesses, at the least, who were present at the making thereof; nor unless it be proved, that the testator, at the time of pronouncing the same, did bid the persons present, or some of them, bear witness, that such was his will, or words to that effect ; nor unless such nuncupative will be made in the time of the last sickness of the deceased, and in his*

IN ERROR.
‥‥‥‥
ALBANY,
Nov. 1822.

PRINCE
v.
HAZLETON.

*dwelling-house, or where he had been resident for ten days or more, next before the making of such will, except where such person was surprised or taken sick from home, and died before his return to the same.*"   By the 15th section, it is declared, "*that after six months from the speaking of the pretended testamentary words, no testimony shall be received to prove any nuncupative will, except the same testimony, or the substance thereof, was committed to writing, within six days after the making of the said will.*"

The requisitions of this act must be satisfied; there is such perfect perspicuity in the language made use of, that if doubts existed as to the law, previous to the passing of the act, none can remain at the present day.   If the statute is so plain, as to be incapable of misconstruction, then, without reference to the law previously in force, it must be carried into effect, according to the intention of the legislature.   If it gives a new rule, that rule must be observed.   In such cases, no consequences are to be regarded in the construction.   (6 *Bac. Abr.* 392.)   On the other hand, if a statute makes use of words, the meaning of which are well known at the common law, the words shall be understood in the same sense; and hence it frequently becomes necessary to know, what the common law was before, and what the mischief was, for which the common law had not provided. These general remarks may be considered not inapplicable, in examining the soundness of the legal objections made by the appellant's counsel.   It is contended, that admitting the respondents' witnesses have testified truly, they do not make out a case within the act.   The objections are, first, that "*last sickness*" means sudden illness, when the testator is *in extremis*, and in the immediate prospect of death; and, secondly, that the will is void, because no executor is named.   To guard against impositions and forgeries, in setting up nuncupative wills, the statute was passed, and has imposed several salutary restrictions.   In discussing the first objection, it will be useful to inquire, how the law stood before the passing of the act.   If we can ascertain the common law exposition of "last sickness," I admit it will go far to show how the statute is to be understood.   If no light can be derived from the common law in explaining these

terms, then the words "last sickness," in the statute, are to
be construed according to their obvious import, which is, the
sickness immediately preceding the death of the testator,
without reference to any precise period of the disease, or
any particular apprehensions the testator may be under, as
to his approaching dissolution.

The doctrine in relation to nuncupative wills, is derived
from the civil law, and is of very ancient date.    (*Cowp.*
90.)   It was incorporated into the system of the common
law, and acted upon, *proprio vigore*, long before the statute
of frauds, and the statute of wills, as will be shown in the
course of this inquiry.

In the institutes of *Justinian*, (lib. 2. tit. 10. sec. 14.) it
is laid down, "if a man wishes to dispose of his effects, by
a nuncupative or unwritten testament, he may do so, if, in
the presence of seven witnesses, he verbally declares his
will; and this will be a valid testament, according to the
civil law." It seems, that neither last sickness, nor any
sickness, was necessary to give it validity; it was sufficient,
if the witnesses, within a reasonable time after the death of
the testator, went before a magistrate, and giving an account
of what took place, a formal statement was drawn up and
signed.   *Swinburne* (part 4. sec. 29. p. 350.) says, " in
making a nuncupative will, this is chiefly to be observed,
that the testator do name his executor, and declare his
mind by word of mouth, without writing, before witnesses ;
no precise form of words is required, so that the testator's
meaning do appear." So, also, in *Swinburne,* (part 1. sec.
12. p. 58.) it is said, " a nuncupative testament, is when the
testator, without any writing, doth declare his will before a
sufficient number of witnesses.   It is called nuncupative, be-
cause, when a man makes such a testament, he must name
his executor, and declare his whole mind before witnesses."
The author then observes, "This kind of testament is com-
monly made when the testator is very sick, weak, and past
all hope of recovery." Here, I think, we may discover the
source of that erroneous impression, which some elementary
writers entertain, that it is of the essence of a nuncupative
will, that it be made *in extremis*, or when a man is sick and
in fear of death. *Swinburne*, who, in substance, lays down

the same rule, in respect to nuncupative wills, as that sanctioned by the civil law, does not give the least countenance to the notion, that sickness is at all necessary. He merely states the times when these wills are generally made, not that any particular time, or any sickness is necessary. He had before shown it was not; but he evidently introduces it, in order to give the reason why men defer a business of such importance to so late a period. He observes, "it is a received opinion, amongst the ruder and more ignorant people, that if a man should be so wise as to make a will in health, that then surely he should not live long after, and therefore they defer it until a time of sickness." (p. 59.) From the preceding authorities, it is obvious, that before the statute, the validity of a nuncupative will did not depend on the fact that it was made in the last sickness. *Blackstone*, who is supposed by the appellant's counsel to hold a different language, will, I think, on examination, be found not to contain any thing in opposition to the preceding authorities. In 2 *Com.* 500., the author very concisely remarks, "that a nuncupative will depends merely upon oral evidence, being declared by the testator *in extremis*, before a sufficient number of witnesses, and afterwards reduced to writing." He no where says that it is necessary to be made *in extremis*; the reference is obviously to the time generally chosen for the making of such wills, " being declared by the testator *in extremis*;" which, as a general proposition, is undoubtedly true. He evidently intended to state this fact, as *Swinburne* had done. If the doctrine, derived from the civil law, was intended to be questioned, this accurate writer would have given some intimation, from which such a conclusion might fairly be drawn.

In 7 *Bacon*, (tit. *Wills*, D. 305.) the author, speaking of nuncupative wills, gives this definition : " when a man is sick, and for fear of death, or want of memory should surprise him, if he staid the writing of his testament, desires his neighbours and friends to bear witness of his last will, and then declares the same presently by word, this is called a nuncupative will." There is no doubt this is all correct. A will made under such circumstances would be valid ; but it will be remembered, that the question is, whether a will

would not *also be valid*, if not made in sickness, and for fear of death. *Bacon* does not assert that it would not. We must, therefore, suppose, that in speaking of such will, he had in view, that nuncupative wills are generally made under the circumstances he describes; and that he meant only to say, that such wills were good. The authorities he cites (1 *Inst.* 111. and *Perkins*, 209. sec. 476.) do not contradict the rule of the civil law, nor state any thing in opposition to the doctrine laid down in *Swinburne*.

IN ERROR.
........

ALBANY,
Nov. 1822.

PRINCE
v.
HAZLETON.

As further evidence, if any is wanting, that *Bacon* so understood the law, we find, in a case (7 *Bac.* 339. tit. *Wills.* 1 *Eq. Cas. Abr.* 403.,) where a question arose as to the validity of a nuncupative will, it is merely stated, *that the testator was ill.* No objection was taken on this point, but there were other difficulties, which, if they had been removed, the will would have been good. I will not trespass on the patience of the Court by pursuing this inquiry farther. I think it is perfectly settled, that before the statute, a good nuncupative will might be made at any time, if proved by witnesses; and, although, for reasons already given, men generally deferred the making of such wills, until overtaken by sickness, and in fear of death; yet that the law did not place wills, made at such times, on more favoured grounds than if made at a different period. The consequence, then, is, that there is nothing in the common law to aid in giving a construction to the terms " last sickness," made use of in the statute; and, therefore, the statute must be considered as introducing a new rule, or, perhaps, more correctly speaking, restricting the period in which nuncupative wills may be made, by confining it to " last sickness," instead of leaving the time in the discretion of the testator. If any thing more was necessary to prove the soundness of the doctrine I have advanced, it seems to me the statute itself contains the most satisfactory evidence. It is admitted, that the statute was intended as a remedy for the frauds and impositions which grew out of the common law. The various regulations introduced, were for the express purpose of serving as checks and barriers against fraud. The statute does not purport to be declaratory of the common law, but is a

IN ERROR.
.......
ALBANY,
Nov. 1822.

PRINCE
v.
HAZLETON.

remedial statute. The period in which a valid nuncupative will might be made, was no longer to remain in the discretion of the testator; but, as offering less opportunity for imposition, the statute confined it to his "last sickness." That requisite was inserted, because, the common law had not provided any such restriction. *Blackstone* observes, (vol. 2. p. 501.) in commenting on this statute, "it must be in the testator's last sickness; for if he recovers, he may alter his dispositions, and has time to make a written will." The inference drawn from the statute is in coincidence with the doctrine derived from the common law.

But it is said, that this will is not valid, because no executor is expressly appointed. Without examining whether the naming an executor was essential to every testament, it is sufficient to show that an executor, *eo nomine*, need not be named in words.

*Swinburne* (part 4. sec. 4. p. 247.) observes, "if the testator says, I commit all my goods to the disposition of *A. B.*, it is, in effect, as if he says, I make him my executor, for it thereby appears he did not intend to die intestate." Here, the testator has given all his personal estate, and that is a valid appointment of executor. I apprehend, that in every case, a nuncupative will may be valid without naming an executor. In 2 *Black. Rep.* 503., the author states the proposition generally, that if the testator makes an incomplete will, without naming an executor, administration may be granted *cum testamento annexo*. (1 *Roll. Abr.* 907. *Comb.* 20.) This appears to have been done in several cases. In *How* v. *Godfrey*, (*Finch's Rep.* 361.) letters of administration, with the will annexed, appear to have been granted on a nuncupative will, when no executor had been appointed. The long and uniform practice in this respect, is opposed to the objections urged, that the appointment of an executor, in the will, is essential.

Some criticisms were applied to the testimony of the witnesses who proved the will, which I will briefly notice; it is objected to Doctor *Arden's* testimony, that after stating the expressions of the testator, he says, "or words to that effect." That *Waters* uses the words, "should have all the

property he was worth ;" and *Ellen Taylor*, that " all that
he had or was possessed of, was for Mrs. *Hazleton*."    I
have already shown that no precise form of words are requir-
ed by law :—if the intent and meaning can be collected,
that is sufficient.    *Swinburne* lays this down expressly.    I
have not discovered any rule of law opposed to it.    Indeed,
so long as nuncupative wills are allowed, no other rule would
be applicable to the subject.    We need not be informed that
no witness could be relied on, as to every indentical word
made use of by the testator.    All that can be expected is to
give the substance.    No doubt, very nearly, the same words
used by the testator may be retained ; and when a witness testi-
fies to the expressions, we understand him, that the words
so testified to, convey accurately the meaning of the testator,
but no one would consider the witness as speaking techni-
cally in " *hæc verba*."    There is no force, then, in these objec-
tions, provided the words proved by the witnesses, show the
meaning of the testator.    If the testimony in this case is
true, the words abundantly prove the intent, that Mrs. *Ha-
zleton* should, after the testator's death, have all his pro-
perty.

The remaining question is, does the testimony satisfacto-
rily prove that the will in question was made ?

It does not appear to me extraordinary, that this question
has been litigated with uncommon zeal ; neither ought it to
excite surprise, to find contradictory testimony in some ma-
terial points.    It was to be expected ; it is an angry contro-
versy, where disappointment on one side, and the hope of
establishing the will on the other, have excited great compe-
tition.    Here is a foreigner with considerable property,
about to leave it soon.    Whether he has any heirs in his na-
tive country is uncertain ; he thought he had none ; if he
had, it is very evident he felt no sympathies or interest for
them ; all connexion seemed to be dissolved ; years had pass-
ed away without any communication ; he had changed his
name ; in short, whatever may have been the cause, it does
not appear, that a single human being had any hold on his
affections, so as to be a particular object of his bounty.    In
this situation, he is confined by sickness, and although he
entertained hopes of recovery, it cannot be doubted, he

IN ERROR.
........

ALBANY,
Nov. 1822.

PRINCE
v.
HAZLETON.

must have had strong apprehensions that his end was near. I think it quite evident he was not disposed to make a written will.

The formal act of dictating a written will, may have appeared too much like the precursor of dissolution ; or his apathy might be such, that he would not go through the formalities of so solemn an act, and yet might be willing to say, " *A.* or *B.* shall possess my property after my death." He might have a predilection enough for some individual, to do the latter, for it was attended with no trouble or effort, but would have died intestate, rather than submit to the former.    Who can point out, with certainty, the object of his regard ?  He was eccentric, of singular habits ; fretful, suffering at times excruciating pains.    Is there an individual that will pretend to such knowledge of the human heart, the motives and springs of human action, as to say, that the faithful attendant on the sick bed of the testator, who had devoted days and nights to mitigate his sufferings and soothe his pains, would not probably be deemed a fit object of his bounty ?  For myself, under such circumstances, I have no hesitation in saying, such a disposition of his property is at once natural, if not to be expected.    If the result of this examination shall be, to prove the making of a will, this Court, sitting to discharge the duty of discreet Jurors, will not erect itself into a tribunal to say, the testator ought not to have devised in this manner ; neither will it feel itself at liberty to disregard the testimony in support of it, unless it shall be successfully impeached, according to the rules which govern in a Court of Justice.

Four witnesses have been examined to prove the will.    If they, or any three of them, are to be regarded as credible witnesses, it is abundantly proved.    I shall begin with Doctor *Arden*.    His general character is not impeached.    I cannot travel out of the case to inquire respecting him ; I think it will be admitted, if aught could be alleged against him, it would not have been withheld.    I am constrained to believe he has stated the truth, unless it be shown that his evidence is contradicted in material parts.    He not only swears to the making this nuncupative will, but that on several occasions, previously, the testator declared his intention, to

IN ERROR.
........
ALBANY,
Nov. 1822.
PRINCE
v.
HAZLETON.

give all his property to Mrs. *Hazleton ;* and subsequent-
ly declared *he had* given to her all his property. If this
man is perjured, his depravity must be confirmed and set-
tled. In the complication of testimony, nothing has trans-
pired to assign a motive or inducement for such a course ;
no connexion or intimacy is traced between him and the
respondents. Before he is consigned to infamy, he has a
right to demand the evidence upon which his criminality is
founded. I have sought for it, in vain, and, therefore, am
bound to believe him.

But it is urged, that his testimony is contradicted. He
says, he was called to *Jones* as a patient, by finding a me-
morandum on his slate, by some person, but what person he
never knew : is this disproved ? So far from it, *Taber*, an
unimpeached witness, says, that a man did call at the office
of Doctor *Arden*, and left a message on the slate for him.
*James M'Donnell* testifies, that it was proposed by *Jones* and
Mrs. *H.* that he should go to Doctor *Arden ;* that he went,
saw him, and delivered his message. In all this, I perceive
no contradiction ; the testimony is consistent and reconcila-
ble ; the fact, that *Arden* was called by a message on the
slate is proved to be true. Some person did call, and as
*M'Donnell* appears to have been the only person sent, and
inasmuch as he has not denied that he left that message, nor
been questioned respecting it, as might have been done, had
it been deemed material, the fair presumption is, that he was
the man that called, and not finding *Arden* at home, after-
wards saw him, and delivered the message personally. But
whether he was the person or not, is immaterial ; *M'Donnell's*
request does not, in the least, falsify the statement of *Arden*,
that a message was left on the slate ; both are undoubtedly
true, and admit of perfect explanation. That he was sent for,
and at the request of *Jones*, is proved. It is difficult to con-
ceive, why this unimportant circumstance was pressed, as a
ground for impeaching the testimony. Another ground is
this : *Arden* says, he never heard any friend, visiter, or attend-
ant, make a request to call in a clergyman. *Julia Devoy*
testifies, that she urged to Doctor *Arden*, the calling in of
the Bishop ; that the Doctor observed, that he should allow
no clergyman to come that night. Here is contradictory

testimony, not as to the fact whether a will was made, but in relation to the solicitude expressed by Mrs. *Devoy*, for the spiritual concerns of the testator. This is the only contradiction I have discovered in *Arden's* testimony; and it admits of a satisfactory answer. Allowing Mrs. *Devoy* to be an unimpeached witness, which I think will be shown she is not, then, is the evidence of *Arden* falsified by her? It is not, by any rule of evidence with which I am acquainted. In case the request to send for the Bishop was a material fact for the respondents to make out, I admit the evidence would be neutralized, and go for nothing, because the affirmative must be made out by a superior weight of testimony, and as the scales are balanced, the affirmative is not established; but no inference can rightfully be drawn, that the testimony of *Arden* was false, although it may be evident that the testimony of one or the other was necessarily so. If both witnesses stand unimpeached, independent of the fact that they disagree as to a particular thing, the scales are in equilibrio, and other things being equal, they are each entitled to credit. I put this in the strongest point of view for the appellant, and it will not aid him, for there is as much reason to believe Doctor *Arden* as Mrs. *Julia Devoy*. But is it consistent with the rules of interpreting and reconciling testimony, to push the doctrine thus far? Does not the experience of every member of this Court attest to the truth of the proposition, that memory is frail, that misapprehension and mistake are incident to man, that the law will charitably attribute discrepancies in testimony to some of these causes, rather than to deliberate perjury, if, from the nature of the case, there may have been forgetfulness or mistake? Who that is conversant in Courts, does not know, that it is of every day's occurrence, for credible and intelligent witnesses to take a different view of some circumstances in the same transaction, and if called upon to testify, may, in some unimportant particulars, at least, contradict one another? Would the duty of a Judge, for such cause, require him to instruct the jury to disregard it? I apprehend not. I have supposed the case, in the remarks that I have made, that Doctor *Arden* and Mrs. *Devoy* were equally credible. The farther examination of this cause will, I think, show how little she is

entitled to such a character. *Arden*, then, has passed the ordeal unhurt, and proves that *Jones* made a will. The next witness is *George Waters;* his testimony is substantially the same as *Arden's;* his attendance was unsolicited and accidental; he had never seen *William Lee*, another of the witnesses, before the 11th *April*, when he met him at *Jones's* room. The testimony of this witness fully proves the will; it is not impeached, and is entitled to credit.

The next witness is *William Lee;* he also proves the will. He says he was requested by Doctor *Arden* to go with him to see a sick patient; he went; he never saw Mrs. *H.* until he met her at the house where *Jones* was lying sick. His testimony, in substance, concurs with that of *Arden* and *Waters;* but it is assailed on several grounds. I will briefly consider them. *Lee* says, that on the third of *May*, Mrs. *H.* called on him, and gave him the first information of *Jones's* decease. *Walter Furlong* testifies, that he informed *Lee* of the decease of *Jones*, *the morning he died.* Whether *Lee* received the information on the 15th of *April*, or the 3d of *May*, is a circumstance irrelevant and unimportant, in respect to the subject of this will; it could have no effect whatever, allowing that the witness intended to aid the cause of Mrs. *H.* If *Lee* was corrupt enough to sacrifice his integrity, he would have testified falsely to some fact that might be material. It would be in character, for a knave, on prudential grounds, to adhere to truth in circumstances of no moment; he would not expose himself to contradiction where nothing could be gained. I perceive no motive for stating the time of receiving information falsely. The law will not impute perjury on such a state of facts, but will ascribe the variance to misapprehension or mistake; besides, *Lee*, who swears to one day, is equally credible as *Furlong*, who swears to another.

If this was an ordinary case, before a jury, exciting but little interest, I am persuaded the contradiction, merely as to the time when notice of *Jones's* death was received, would not be seriously urged; if it was, it would not, and ought not to be listened to.

But, it is urged, that *Lee's* general character is impeached. It is proper here to remark, that evidence of this kind,

IN ERROR.
·······
ALBANY,
Nov. 1822.

PRINCE
v.
HAZLETON.

although admissible, is to be critically examined, and very deliberately considered, before it is acted on. When a witness testifies, that the general character of another is bad, and goes no further, it cannot be satisfactory; for that would subject the character of an individual to the opinion of the witness, and not to the general sense of the community, respecting the person sought to be impeached; hence it becomes necessary, and is always competent, to inquire, whether the community generally, or a few individuals, speak ill of the person implicated, and whether such persons may not have been biassed by prejudices of whatever kind, and whether they have not had some disagreement, controversy, or quarrel. The weight that such evidence is entitled to, will depend on considerations like the preceding, and others of a similar nature.

It is what the community say generally of a man, that is evidence; not what this or that individual may say. Deplorable, indeed, would be the state of society, if the opinions of two or three individuals should be deemed sufficient to establish a general bad reputation. In times of party contention, if not at all times, it would not be difficult to prove, in any given case, that a few individuals had spoken against the character of the witness, or person on trial, when the general voice was otherwise. It is not evidence at all, where the witness who impeaches another has formed his opinion merely on what *A.*, *B.*, and *C.* have informed him. If the witness has only heard *A.* and *B.* speak of the individual implicated, then he is not sufficiently informed to make out what is required, and the party who calls him must resort elsewhere. On principle, it is highly expedient the law should be so; for this species of evidence deals in no specific facts, and, consequently, no investigation can take place as to the truth or falsehood of the matters which have made an unfavourable impression against a witness; all that can be done is to give evidence of general good character. The proceedings in our Courts of Justice show, that evidence to impeach, or support, is obtained without apparent difficulty; it is not conclusive in any case, but is powerful and operative, when the general sense of those acquainted with a witness, is unfavourable to his truth

and integrity. The law has considered character sufficiently IN ERROR.
.......
ALBANY,
Nov. 1822.

PRINCE
v.
HAZLETON. guarded, by allowing it to be assailed only when the general opinion was against it. General opinion raises a strong presumption that there are facts to support its justice and correctness ; but the opinion of this or that individual, raises no such presumption.

The preceding remarks apply to the testimony introduced to impeach *William Lee.* The first witness, *Pensford,* says, his general reputation is bad, but admits that he never heard more than two or three persons speak ill of him. Will this satisfy the rule of law that the general character is bad? I think not.

*Gross* swears, that he would not believe him on oath, and has heard from a number of persons that he was a bad man. *Carter* says, that *Lee's* character, for truth and integrity, is not good ; and that he is not entitled to be believed as a witness.

This is the evidence for the appellant.

The respondents have resorted to the same kind of evidence to support *William Lee,* in which they have succeeded. Nine witnesses testify favourably of his character ; and that he is to be believed on oath. There is a variation in the forms of these depositions; some are more full and explicit than others. I have considered the criticisms applied by the counsel on the argument. When a witness says, that " from the general character of *William Lee,* for truth and integrity, he would believe him on oath as a witness," I cannot intend that his character is presented in a questionable shape ; that the witness meant to say, he has just so much character as will entitle him to belief, and nothing more ; and by using such terms, to present the witness as suspicious. The fair import is decidedly in support of a good reputation for truth and veracity. But *West, Johnson,* and *Quin,* speak in more general terms ; they know his general character, for truth and veracity, to be good. *They alone* are more than sufficient to counterbalance the evidence of *Gross* and *Carter,* on whom the appellant most relies. This attempt has failed altogether. Has *Furlong* proved any fact injurious to the credit of *Lee* ? How this deposition can be made to bear on the truth of *Lee,* I confess I am ignorant.

If *Lee* was under any obligation to disclose to his journeyman, *Furlong*, what he knew respecting *Jones's* will or property, this deposition would, indeed, prove he had not done so, and for which *Furlong* might complain; but admitting the obligation to gratify the curiosity or inquisitiveness of *Furlong*, how does it affect *Lee's* truth? To attempt to prove that it does not, would be a waste of time. As a specimen, take the following : *Furlong* says, *Jones* died without making a will; *Lee* replies, " it was a great pity." *Lee* inquired where *Jones* lived, and whether *Furlong* knew how the property would be disposed of; that it was a great pity it should fall to the State, and not go to his relations in *Ireland.* Such are the opinions expressed by *Lee*, and such the manner of his conversation with *Furlong*.

No principle of morals or ethics, required *Lee* to state all he knew; he was at perfect liberty to communicate his knowledge, or remain silent; and if, by his manner, *Furlong* drew an inference of *Lee's* ignorance on the subject, I am not aware of any impropriety, much less that any criminality attached upon his conduct. He was bound to speak truth, when he did speak; but he was not prohibited from making inquiries, or expressing regrets.

*Furlong* had no interest in, or connexion with, the will, or the parties to it, and could sustain no injury by remaining in ignorance. *Lee* acted with prudence, and proper reserve. When inquired of how he could be a witness, he gives a satisfactory explanation; " he did not think proper to inform *Furlong* what he knew."

Thus, have I examined the testimony of three witnesses in support of this will, with the various objections to their credibility, and arrive at a conclusion entirely satisfactory to my own mind, that a nuncupative will was fairly and *bona fide* made, answering all the requirements of law, and vesting in the respondents the property of the testator.

With respect to *Ellen Taylor;* the aid of her testimony is not required. It is admitted, that she is contradicted in so many particulars, that unless supported, she is not entitled to credit. She is a woman of colour, who attended *Jones* in his sickness, and, probably, of that class who are not under

the control of moral restraints. Any number of witnesses, impeached as she is, would not be sufficient to establish a fact. It does not, however, follow, of necessity, that she has not testified truly as to this will. If two credible witnesses proved the fact, and she is called as a third witness, will it not satisfy the words of the statute? It is well known, that the unsupported evidence of an accomplice, is held not sufficient to convict; but if that accomplice derives support as to some of the material facts, it will warrant a conviction. The statute requires the will to be proved by three witnesses. Does it place the testimony on different ground from a case where witnesses are called to prove any other fact? Does it deny the aid in support of a witness that would be admissible in other cases? May not such aid be derived from the same sources? I perceive no objection in the letter or spirit of the act. If, in an ordinary case, she had been called as a witness, and had proved a material fact, and the opposite party, as in the present case, had shown so many contradictions as to discredit her, the introduction of two other witnesses, swearing to the same material fact, would restore her credit in the particular instance; and, according to the settled rules of evidence, it could not be said she was not, on that occasion, a credible witness. It is true, her testimony, in that case, would not become indispensable, because the same thing was proved by others; but, on the question, whether she had sworn truly, it must be answered in the affirmative. Apply this principle to the present case. She is a competent witness; the objections go to her credit. If her credit is restored, is it material by what witnesses that is effected? If two credible witnesses prove the same fact, and that *Ellen Taylor* was also present, and heard what was said, where is the principle of reason or law, that will not allow her testimony to be corroborated and supported on such grounds? The statute has not interposed any such barrier. It speaks not of credible witnesses generally, but of three witnesses, against whose competency there is no valid objection. When such are produced, I apprehend the fact is to be made out by the three; and that from all the evidence before the Court, the question is, whether each witness has testified truly.

IN ERROR.

ALBANY, Nov. 1822.

PRINCE v. HAZLETON.

IN ERROR.
.......
ALBANY,
Nov. 1822.

PRINCE
v.
HAZLETON.

To illustrate the principle I have laid down, I will sup-pose that *Jones* made his will in the presence of two honour-able members of this Court, whose testimony was above all exception, and that *Ellen Taylor* was also present, and no other person.   Would all this evidence be rejected, because *Ellen Taylor* was discredited as to collateral facts ?   Would not the result be, that thus supported, she is to be believed ; and, therefore, the will is well proved ?   Such are my views on this point, and such would be my conclusion, were it ne-cessary to decide the point.

I will now examine the assemblage of circumstances, evi-dently got up at the instigation of *Devoy* and his wife, in-fluenced, as appears to me, by the consideration that as they had been disappointed in obtaining a will, to defeat Mrs. *H.* in her claim would afford the only chance of reaping a portion of the spoil ; trusting to the gratitude of *Jones's* relations, if he had any, or, in the words of *Devoy*, " that he would leave that to their own generosity."

The testimony remaining to be examined is not imme-diately directed against the witnesses, on whom the respond-ents rely ; but to render it improbable a will was made, by proving the conduct and declarations of *Jones* and Mrs. *H.*, *Patrick Devoy* testified, that he never said any thing to *Jones* about making his will, nor did he mention that subject himself, nor did any person mention the subject in his hear-ing ; that Doctor *Torbert* informed him (*Devoy*) that a will must be prepared, and submitted to *Jones* and his clergy-man, to be signed, if *Jones* liked it.   *Devoy* admits he said to *Torbert*, that a will, dividing the property of the deceased equally among his friends would be satisfactory ; but that he never gave *Torbert* any directions, *that he was to have a share of the property*.   Here, then, we find *Devoy* active in procuring a will, without ever having consulted the testator, or, by his own account, ever having received the least intima-tion that *Jones* intended to give him any thing.   This alone places him in a suspicious point of view.   But Doctor *Tor-bert* contradicts him ; he says he went, at the request of *De-voy*, to see if he could not make *Jones's* will ; " that the pro-visions thereof were made known to him by *Patrick Devoy* ;" and that " *Devoy* was named as an heir or legatee in the

OF THE STATE OF NEW-YORK.

IN ERROR.
·······
ALBANY,
Nov. 1822.
PRINCE
v.
HAZLETON.

will he had written." That Mrs. *H.* did not feel disposed to aid this man in seizing on his prey, cannot be doubted; nor but that she was justifiable in endeavouring to divert him from his purpose by all lawful means. She had much to apprehend from such a combination. Her anxiety may have induced her to say more than was consistent with truth. If she has done so, it must be remembered that she is not a witness in this cause; the validity of the will cannot depend on her subsequent declarations, made with a view to guard what she had obtained, and prevent its being wrested from her. *Torbert* inquires, whether *Jones* had made a will; she answers no; that when the subject is mentioned, it puts him crazy. As to the first, she may have considered the answer strictly true, as there was no written will. It seems that Mrs. *Newkirk*, an unsuspected witness, informed the Surrogate, that she knew nothing about a will, and in explanation says, she had reference to a written will. As to the latter, it will be recollected, that this was the day preceding *Jones's* death; and no witness has testified that the declaration was untrue at the time it was made; she may have had reference to his then state, which was but a few hours before his death. This may all be true; for although *Fleury* conversed with *Jones* about making a will, when he discovered no particular agitation, that was several days previous, and does not necessarily contradict what Mrs. *H.* stated to Doctor *Torbert.* Again, *Devoy* says, he and *Mullen* remained with *Jones*, on the night of his decease; that about midnight *Jones* called him to his bedside, and directed Mrs. *H.* to leave the room; that she went and sat down by the foot of the bed; that he then inquired whether she was gone; and being answered, no, *Jones* then ordered her to leave the room, and, after she had left it, directed *Devoy* to put a ketch on the door, which he did; that *Jones* then inquired who was there; and being informed it was *Mullen*, he was satisfied. That *Jones* then said, he would be removed in the morning to *Devoy's*, that the Bishop should be brought, and he would settle his affairs; that he ordered *Devoy* to ring the bell, and get the keys from Mrs. *H.* having first inquired if *he* had his keys; that he then began to talk of his property, complained that Mrs. *H.* neglected him, carried his liquor up stairs, and that she and

IN ERROR.
.......
ALBANY,
Nov. 1822.

PRINCE
v.
HAZLETON.

another woman got drunk; and that, shortly after, he expired. This story, on the face of it, is incredible; if not, it evidently shows, that *Jones* was deranged. It is so extravagant and improbable as to discredit itself; but it is refuted. *Taber* testifies, that he remained with *Jones* on *Sunday* night, until 2 o'clock in the morning; that the man who sat up with him, (meaning *Mullen*) was drunk; that he and *Devoy* drank freely of spiritous liquor, and that *Devoy* was also affected by the liquor he drank. He further testified, that he was awake all the time, and did not hear *Jones* find any fault with Mrs. *Hazleton*; that Mrs. *H.* went to bed about 1 o'clock, at *Taber's* request. Even *Mullen* does not countenance the statement; he did not hear *Jones* say any thing about removing to the house of *Devoy*. Sitting, as a juror, to decide dispassionately on facts, I should consider this story of *Devoy* an entire fabrication; besides, if there is any one fact clearly proved, it is, that Mrs. *H.* was a kind, faithful, and attentive nurse, and it was so admitted by *Jones*, repeatedly. On *Saturday* evening, *Taber* says, *Jones* informed him he had given Mrs. *H.* all his property; that the conversation was loud, and could be heard in every part of the room. *M'Donnel* testifies, that *Jones* said, Mrs. *H.* was a fine clever woman; to Mrs. *Newkirk* he said, he had trusted all, and his life, in her hands. *Edward Polleck* says, that Mrs. *H.* paid very strict and constant attention to *Jones* during his illness; that *Jones* seemed grateful for her services; that she was one of the best nurses he had ever seen or known, in her attentions to *Jones*. More need not be said, to show that *Devoy*, is entirely unworthy of credit.

As to Doctor *Torbert's* testimony, I have already remarked on that part which seems to have been intended to make against this will. It has but a slight bearing on the question in controversy, and might have been withheld without injury to the appellant, and Dr. *Torbert* thereby relieved from the necessity of placing himself before the public *in no enviable point of light*. He drew two wills; in his own words, " not liking the first, he drew the second," naming himself as executor, and *Devoy* as heir.

I have already referred to part of the testimony of *Julia*

IN ERROR.

ALBANY,
Nov. 1822.

PRINCE
v.
HAZLETON.

*Devoy*, her anxiety to send for the Bishop, and urging it upon Doctor *Arden*, which is expressly denied by him.

Whether her statement, that Mrs. *H.* said there was a will, and that she and her husband were remembered in it, and requested her to keep still, is true or false, the present question cannot be affected by it. It is possible that Mrs. *H.* may have resorted to such a device to check the intermeddling of *Devoy* and wife ; or, which is more probable, that her words were not measured or studied at this time, when her mind, without doubt, was much agitated. She was a woman, and alone ; her husband not present to advise with her ; a large sum devised to her, was in jeopardy ; the public administrator was taking charge of the property ; no legal adviser was present. In such circumstances she may have spoken unadvisedly and incorrectly. She saw the storm that was gathering, and may have been indiscreet in the means used to avert it. The witnesses who proved the will, cannot, on such grounds, be impeached ; nor are they responsible for any indiscretions of Mrs. *H.*

It is well established by the proof, that *Jones* was not disposed to make a written will. *Fleury* says, that three days before *Jones* died, he pressed him to make a will, as he was then very ill. *Jones* did not consent, and observed, he did not feel so low as to make a will *then*. To my mind, it appears evident, that he wished to evade the urgent solicitation of *Fleury*. On Sunday evening, *Fleury* heard *Jones* observe to a *Spanish* gentleman, in the *Spanish* language, that he would not see him alive the next morning. *Jones* was of a sound mind. *Fleury*, who had urged the necessity of a will, and who had tendered his assistance, was present. I think, it must be presumed, that he died satisfied with what had already been done. There was no restraint upon the testator ; there is no proof that any fraud or imposition was practised on him. If there has been a conspiracy, I have not been able to discover it, after the most attentive consideration. The suggestion that, in the prospect of dissolution, this stranger in a foreign land, would fasten his affections on the country that gave him birth, is both natural and just. The picture so ably drawn by the concluding counsel, was not the creature of fancy, but the representation of real life. In

IN ERROR.

ALBANY,
Nov. 1822.

PRINCE
v.
HAZLETON.

the language of an eminent statesman, it may truly be said, " There exists in every good man a virtuous principle of preference for that country where he first drew his breath; where he passed his childhood; where his mind first opened to the endearing relationships of life, which nothing but the hand of death can extinguish; an *amor patriæ*, which remains in spite of rejection and persecutions; and which, even amidst the conflict of the passions, produced by a sense of injury, still secretly leads him to his native country, as his resting place." I take, for granted, this principle was not extinguished in the mind of *Jones;* but his returning sympathies for his relatives could not be indulged. He did not know that he had a relation on earth. The ties that once existed had long since been severed; this was his belief. There is no proof that his will excluded a brother, a sister, or a parent. In the wide range of selecting the person to inherit his property, we have no control or concern. I am entirely satisfied that the will was fairly obtained; that it was made to reward meritorious services; that it was dictated by partiality and preference for Mrs. *H.,* and therefore ought to be established.

I am of opinion, that the decree of the Court of Probates ought to be affirmed.

AUSTIN, CHILDS, FORWARD, HUNTINGTON, ROSECRANTZ, and VIELIE, senators, concurred.

* Nov. 11th, for *reversing* 23. For *affirming* 7.

But the rest of the Court,* concurring with the Chancellor, that the decree ought to be reversed, it was " Ordered, adjudged, and decreed, that the decree of the Court of Probates, appealed from in this cause, be, in all things, reversed; and it is further ordered, adjudged, and decreed, that the letters of administration of the goods, chattels, and credits, which were of *William Jones,* late of the city of *New-York,* deceased, be granted and issued by the Surrogate of the city and county of *New-York,* according to law, as in cases of intestates; and that the record be remitted to the Court of Probates.

Decree of Reversal.