JOHNSTON, AND OTHERS, COMPLAINANTS, v. GLASSCOCK AND
WIFE, AND OTHERS, DEFENDANTS.

1. The statute of 1836, provides a common mode by which wills, either of real or personal estate, may be established in the first instance before the County Court.

2. The 55th section of the same stataute also provides a new mode by which the heir at law, or nearest of kin of the testator, can contest the will, so that one suit will be conclusive and final; and for this purpose has invested the Court of Chancery with the jurisdiction, authorising it to call in aid the assistance of a jury as in other cases.

3. The same section also provides a period of limitation, much shorter than before was known, after which a will submitted to probate, ceases to be the subject of controversy, and becomes entirely conclusive on all parties interested.

4. The probate obtained in the County Court, is not *prima facie* evidence of the validity of the will in the contest in Chancery. The opportunity given to the heir at law, or nearest of kin, to contest the will in Chancery, is given in the place of the proof, in *solemn form*, of a will of personal property; and of the action of ejectment, when the will is of real estate.

5. The investigation in Chancery must be governed by the same rules and laws which prevailed in similar investigations in the Ecclesiastical Courts, when the will affects personal estate, and the courts of common law, when it passes the real estate, except so far as the statute provides a new rule.

6. In either of these courts, the person claiming under the will, is placed in the condition of an *actor*. Nothing more is necessary, in framing a bill to contest a will under the statute, than to alledge the title, by which the complainant has the right to investigate the probate, and a prayer for relief. If a discovery is wanted, or the circumstances of the case require an injunction, &c., the bill may be framed with a view to such circumstances. The answer should aver every fact and circumstance necessary to make a good will.

7. *Quere*—Whether any probate of a will, under the statute, is necessary to enable a *devisee* to maintain, or defend, an ejectment for the lands devised.

8. The validity of a nuncupative will does not depend on the fact of its being reduced to writing, either before or after the death of the testator, *unless* the probate is deferred for a longer period than six months after the words were spoken. The proof, when the will is contested in chancery, must be of the same quality and degree, (except so far as other evidence is authorised by the 55th section of the statute,) as was proper when the probate was had in the County Court.

9. *Quere*—Whether the *rogatio testum*, in any case, is necessary to be committed to writing, as a part of a nuncupative will, as the statute of 1806 differs from the English statute of Frauds in its terms.

10. The words, *last sickness*, in the statute, are not to be construed to mean *in extremis*. If a person in last sickness—that sickness of which he subsequently dies—impressed with the probability of approaching death, deliberately makes

Johnston et al. v. Glasscock & Wife et als.

his will, conforming to the statute, the will will not be invalid, because he had time and opportunity to reduce it to writing,

11. In such a case, however, the evidence ought to be of such weight as to leave no doubt on the mind of the judge or jury, that the will offered for probate, was, in truth, the will of the deceased; and whenever a will is so made, the Court must be more on its guard than it would be in an ordinary case.

12. The statute does not provide what number of witnesses shall be necessary to prove a will of personal estate; therefore the law, in force previous to the enactment of the statute, must govern. The common law, properly so called, provided no rules with relation to wills of personal property, but adopted the practice prevailing in the Ecclesiastical Courts. This was governed by the civil and canon laws. The same rules and practice must govern similar cases in this State.

13. By the civil and canon laws, two witnesses, in general, are necessary to establish a will of personal estate ; and the same number is required in this State, whether their testimony is to be given before the Probate Court or the Court of Chancery.

14. Under the 55th section of the act of 1806, the certificate of the oath of the witnesses, at the time of the taking of the probate, is made evidence to be admitted to the jury, to have such weight as they may think it deserves, on the trial of an issue in fact out of chancery. The same evidence is admissible when the chancellor decides on the proof without directing an issue.

15. This section of the statute was, doubtless, intended to protect persons claiming under a will, against the *impossibility* of establishing it, if the witnesses were to die after the probate, but before the contest in chancery ; and from the *difficulty* of so doing, when, after the probate, they could not be found. The intention of the statute will be best carried into effect, by considering the examination of the witnesses, at the time of the probate, as an examination in chief, leaving it to those who subsequently contest the will, to cross examine the same witnesses, if they deem it important or necessary to do so.

16. Nuncupative wills are not favorites with Courts of Probate. Much more is requisite to the proof of such a will, than of a written one, in several particulars. In the first place, numerous restrictions are imposed on such wills by the statute, the provisions of which must be strictly complied with. But, added to this, and independent of the statute, the *factum* of a nuncupative will, requires to be proved by evidence more strict and stringent, than a written one, in every single particular; and unless the Court is morally certain, by pronouncing for the will propounded, of carrying into effect the deceased's real testamentary intentions, and no other, it is obviously its duty not to give the will the sanction of its probate.

17. Where the facts stated in the record of the probate, as having been proved when the will was admitted to probate, are inconsistent with the facts proved on hearing in chancery, a strong presumption of fraud arises, which can only be counteracted by showing that no such evidence was given at the probate, and by accounting most clearly and satisfactorily for the, in that event, false language of the record.

18. The rule is perfectly well established, that when a will is impeached on the ground of fraud, the parties who seek to establish it, must remove or explain, and so neutralize the facts out of which the suspicion arises. And this rule is held to apply also to fraudulent acts in relation to the obtaining of the probate.

Writ of Error to the Court of Chancery for the Fifth District of the Northern Division.

This bill was filed, and subpœna issued, the 5th of April, 1839. The bill alledges that the complainants, John Johnston, Hugh B. Johnston, Thomas G. Coats, in right of his wife Olive, James Loftin, in right of his wife Judy, John Loftin, in right of his wife Matilda, Alley Brady, widow, formerly Alley Johnston, Alexander Johnston, Matilda Johnston, Jenney Ellaby, widow, formerly Jenney Johnston, and Alfred Brady, in right of his wife Olive, are entitled to distribution of the estate of John Johnston, deceased, as his next of kin, and heirs at law. The degrees of consanguinity of each of the complainants, are stated in the bill. It is alledged that Johnston died on the 4th or 5th day of March, 1834, in the county of Tuscaloosa, where he had many years resided, possessed of a large estate, both real and personal; that after his death, a certain nuncupative will, which is made an exhibit, was propounded as the last will of said deceased, and admitted to probate in the County Court of Tuscaloosa county; that when this will was admitted to probate, there was no evidence that the deceased called on any persons to take notice that it was his last will, nor any thing to that effect; that the probate was granted without citations to those principally interested; that the testator died on the day before the pretended will purports to have been made; that the deceased, for two weeks and more, next before his death, was not possessed of a sound mind and disposing memory, in consequence of extreme weakness and disease, and was incapable of making a will; that during all this time, he had no lucid intervals sufficient to enable him to make a valid will; that Sarah C. Johnston (the widow of the deceased, and sole legatee,) has since intermarried with Alexander G. Glasscock; that they are in possession of all the estate, real and personal, except what may be in the possession of John W. Foster, who was appointed administrator with the will annexed.

The bill prays that Glasscock and his wife and Foster may answer the allegations of the bill, and show cause, if any they can, why the said will should not be broke and made void, and

the estate, both real and personal, decreed to descend to the heirs at law and distributees of the deceased.

The answer of Glasscock admits his intermarriage with the widow of the deceased; that the deceased died about the fifth day of March, 1834. It alledges that the deceased, a short time before his death, in the time of his last sickness, at his habitation, and while in sound mind, *being in extremis,* made a nuncupative will, whereby he devised all his real and personal estate to his wife, then Sarah C. Johnston, now Glasscock; that this will was reduced to writing by one of three witnesses who were present at the time of making such will, and called on to bear testimony to the same, on the 6th day of March, 1834, the day following the decease of the testator; that this nuncupative will was admitted to probate by the County Court of Tuscaloosa county on the 7th day of April, 1834, and Foster, the codefendant, qualified as administrator *cum testamento annexo;* that the estate was finally settled on the 13th October, 1835, after due notice. The answer then proceeds with a statement of the property which came to the possession of Glasscock in his marriage with the widow of the deceased, and of the debts paid him on account of the estate. It then alleges, that the suit is commenced by Couts without the assent or knowledge of the other complainants, all of whom reside out of the State; that Couts was present a short time after the death of Johnston, and privy to the fact that a will had been made, and had been, or was about to be, admitted to probate; and submits, whether the complainants are not estopped from investigating any question whatever arising under the will, inasmuch as more than five years have elapsed since the will was admitted to probate; and concludes by insisting on the limitation of five years as a bar to any relief.

The answer of Mrs. Glasscock, admits the marriage, &c., and alledges that the deceased, about the 1st day of March, 1834, being then in extreme ill health, and in his last sickness, expressed a desire to make disposition of his estate, and to that end, a short time previous to his death, and while *in extremis,* made the disposition contained in the paper following, to wit:

STATE OF ALABAMA,
TUSCALOOSA COUNTY. } March the 6th, 1834.

I, John Johnston, being mindful of my mortality and impotence of mind, do, in the presence of these witnesses, make the following distribution of my whole property, real and perishable, to my beloved wife ; and if my wife, Sarah Johnston, does marry and have children, the issue of her own body, then and in that case, the whole property to be equally divided amongst them ; and if she dies and leaves no issue, then and in that case, the property to be equally divided amongst her brothers and sisters; and my brothers and sisters, so as to make them equal.

In testimony whereof, we, as witnesses, assign our names the day and date above written.    ROBERT WALKER,
JAMES R. LYON,
THOMAS JOHNSTON.

The answer further alledges, that the deceased, at the time of expressing his intention to make the disposition of his estate, named in the instrument set out, called on the said Robert Walker, James R. Lyon, and Thomas Johnston, whose names are signed as witnesses, to bear witness to the same, and that the said will and disposition, as aforesaid, was committed to writing on the 6th day of March, 1834; that the deceased, at the time of making the said will, was of sound and disposing mind, and fully sensible of the disposition he was making of his estate; and was under the control and influence of no disease of mind or persuasion whatever.   The answer denies the allegations of the bill, that the deceased was incapable of making a valid will, by reason of bodily weakness, and asserts that when the will was made, the deceased was in perfectly sound mind.   The answer of Foster is to the same effect as that of Glasscock, and shows the final settlement of the estate, and vouches the records of the County Court for his discharge from the administration.

The evidence is to the following effect: Doctor Samuel Meek says that Johnston died on the morning of the 6th March, 1834, on North river, in Tuscaloosa county, about six miles above the city of Tuscaloosa.   Witness was the attending physician during the last sickness.   The deceased was af-

flicted more or less for near twelve months before his death; but the disease did not assume a serious aspect until ten or fourteen days preceding the death. That the deceased had lost his sight some six or eight months before his last illness. He died of an inflammatory fever. On the 24th or 25th of February, the deceased expected to die. After the disease assumed a fatal character, the witness was with him every two or three days, and sometimes every day, and he does not recollect that he appeared delirious, except one time, which was previous to the 25th of February. The deceased was not emaciated, but at times appeared to be in considerable pain. With the exception alluded to, the deceased appeared to be in the possession of his mental faculties, and possessed of as much strength of mind as one so severely afflicted could be expected to have. The witness saw him on the 4th day of March, not then expecting to see him again, but thinks he saw him also about the time of his death. On the 4th day of March, he was in the rightful exercise of his mental powers, but was very weak in body, and the witness did not expect him to live twenty-five hours, as he then seemed to be sinking. Previous to its last fatal character, the disease was not of such a nature as to induce a belief that it would terminate fatally in any short time. The deceased could write, but the witness does not know whether he was a good writer; from his circumstances, the witness believes he possessed the usual facilities for writing. He saw business men about the deceased during his last illness, and after his disease assumed its fatal aspect, and such as were capable of writing.

Robert Walker states, that he lived a near neighbor to the deceased; was with him a great deal during his last illness; he was confined some fifteen or sixteen days; his bodily health was good for some six or twelve months previously to his last sickness, with the exception of the affliction that he suffered from his eyes. Witness was with him nearly all the time during his last sickness; for two or three days previous to his death, he was phrenzied some two minutes at a time, not exceeding once a day; he did not suffer much from bodily pain; witness does not know what disease the deceased was afflicted with; believes the deceased thought he would die from the first

of his last illness; deceased frequently spoke to witness about the disposition of his property, and said that he desired his property to be and remain in the possession of his wife, during her life time; and, if she married and had children, he wanted the property to be equally divided amongst them; but, if she died without issue, he wanted an equal distribution of his property among his brothers and sisters, and her brothers and sisters; he made a will, which was short, spoken by word of mouth, and afterwards reduced to writing; this will was made a few days after the commencement of his last illness; witness thinks he died about the fifth or sixth of March, but does not remember the year; the will was made some eight or ten days before his death; from the time of making his will to his death, he was once or twice not in his right mind; the balance of the time he was; the derangement continued only for a few minutes at a time; he spoke to the witness to write his will, the first day of his last illness, but witness declined, saying he was a bad scribe; deceased said he was anxious to make a distribution of his property, and desired to have it done as soon as possible; witness said he was unacquainted with the form required in writing a will; through the negligence of the witness, the writing of the will was deferred some two or three days, and then the deceased was advised, by some two or three persons in conversation, in the presence of those who were visiting him in his last illness, that he could make his will by calling in persons to witness it, declaring it *verbally*, and calling on them whom he had called in, to witness it as his will. Thomas Johnston, James R. Lyon, and the witness, were present when the will was made, and were the persons called on to witness it, in pursuance of the advice before alluded to. The deceased said, that he called us (the persons before named,) together, to substantiate his will, and requested all other persons present, to withdraw from the room. The deceased then said to us, the witnesses, that he wished us then, either to take notice, or that he wished to make a distribution of his property in our presence. He said he desired the witnesses to commit to writing, the words which he should speak, as his last will. He said he wanted his property, both real and perishable in the hands of his wife, that she

might have, hold and enjoy his property, real and personal, to her lawful use and behoof, as long as she lived; if she married and had issue, the property to go to her children at her death; if she died without issue, the property to be equally divided between his brothers and sisters, and her brothers and sisters. The will was committed to writing, a few days after he died, by the witness. Witness does not know that any persons competent to write a will, visited the deceased in his last illness. Witness thinks that the deceased was in his right mind, at the time of making his will; his body was not much reduced at the time, nor did he seem to be in much pain; he made the will in the evening; he seemed perfectly easy. The deceased thought he must die, but had no idea of the time or the moment, but did not think he could survive long. Deceased had neither brother or sister, nor the husband of a sister, to visit him in his last illness— they lived at a distance. The estate of the deceased was worth some three or four thousand dollars. Witness did not know whether the deceased had pen, ink and paper about his house, or not; he generally kept them. Witness thinks it was five or six miles from any place where a competent person to write a will, could be procured. Witness is the step-father to Mrs. Johnston; he had examined Hitchcock's Justice, or the Laws of Alabama, with regard to the requisites of nun-cupative wills, and thinks he informed the deceased of them, at the time of making the will, or a day or two before.

When cross examined by the defendants, he states that he does not know that the deceased had any property at the time of his marriage, except a horse; he received eight hundred dollars with his wife, besides some bedding and other furniture. Witness thinks the decease was in debt when he married, but does not know to what amount; the debt was paid out of his wife's money. The will of the deceased was to be committed to writing afterwards, and proved as a nuncupative will. The will was committed to writing within fourteen days after the death of the deceased, and subsequently proved in the County Court of Tuscaloosa county. The deceased gave as a reason for bequeathing his property, as he did, to the exclusion of his brothers and sisters, that he had written to them of his situation, when he became blind, and requested them to

come and see him, but that none of them paid any attention to him; he reckoned they would come when he was dead, and try to get some of his property, but he wanted his wife to have it, as the most of it came by her. The blindness of the deceased rendered him incapable to write his will. Witness has no doubt that the deceased, at the time of making the declarations to himself, Lyon and Johnston, which they subsequently reduced to writing, and caused to be proved in the County Court, as above stated, designed and intended the declarations to be his last will and testament, and believed them to be so. Witness believes the writing, presented and proved in the County Court as aforesaid, was substantially what was declared by John Johnson deceased, to be his last will and testament, in the presence of the witnesses aforesaid. Witness thinks that, the year after the death, and before July 1835, Thomas Coats, one of the complainants, was in Tuscaloosa county, and that the witness informed him of the will and its contents, and that it had been proved in Court. The will was made at the residence of the deceased, where he had lived for more than a month.

Castleton Lyon knew the deceased in his life time; his last sickness continued from the 19th February, to the 6th March, 1834; he was in possession of his mental faculties, except on one occasion, after it was said his will was made. Witness was with him every day and nearly every night during his last sickness; witness thinks the deceased made his will about a week before he died; he was not very far gone, when it was said he made his will. The witness sometimes thought the decease might stand it two or three months, and sometimes that he would die shortly. Deceased did not speak to the witness of the disposition of his property during his last sickness, but he heard him speak to others of it. Witness heard him say, Father Walker, (Mrs. Johnson's step father,) will you receive Sarah (his wife.) He answered I will; then the deceased called his wife, and took her by the hand, placing it in her step-father's hand, who said he received her with all his heart. The deceased then said, Father Walker, don't you let my people have one dollar of my property, no, not one picayune, for they never have come to see me in all my sickness, but as soon

as I am dead, Coats will come. This happened a few days before his death, and after the time when it was said he had made his will.

James Cardwell.—Is acquainted with the parties to the suit; was not present when the deceased made his will; he thinks the deceased was taken sick between the 17th and 21st February, and died on the 5th or 6th of March, 1834; he understood the will was made a short time before his death, but has no distinct recollection as to the time; he saw the deceased every day; and he appeared nearly the same from the time he was taken ill, until within a few days of his death; although he was sicker at times than at others, as all sick persons are. He could walk about in the house with assistance, until some three, four, or five days before his death, but the witness does not distinctly remember about it. He does not know that the deceased had implements for writing about his house, but thinks he had. Witness thought the mind of the deceased was good up to the time of his death, except once for a few minutes. The deceased was blind from six to eight months previous to his death, and was incapable of writing. The deceased told him he was broken and in debt when he married, that he had no property but a horse and his clothes; he owed from three to four hundred dollars, which was paid after he married, with money obtained by his wife.

James R. Lyon.—Says he was acquainted with the deceased, for a number of years previous to his death. He knows he made a verbal will, and was present when it was made. He heard no one advise him to make a will. He was alone with the deceased when the will was made, and no other person was present. The deceased said he wanted his property to go to his wife during her life; if she had issue at her death, he wanted it to go to them; if she died without issue, he wanted it to go to his brothers and sisters, and to her brothers and sisters. He was told by the deceased, that he wanted to have some conversation with him, and that he wanted to tell him what disposition he wanted made of his property, if he should die; that he expected to die, and then he made the disposition of his property as before stated. Witness understood the de-

ceased to mean the above disposition of his property as his will, and that he wished him to recollect it as his will. He does not recollect that the deceased called on him, to take notice, that such was his will, but he understood him to intend such to be his will, and to be written down and recorded as such. This was eight or ten days before his death, and he thinks the deceased got worse from that day, and that he was not able to sit up much, if any, afterwards. Saw the deceased every two or three days. He does not know whether the deceased had implements for writing or not, but thinks he had. He was unable to write from blindness. Witness thinks that Esquire Walker had heard, that he knew something about the will of the decease, and called on him. Witness stated what the deceased had said to him, and the will was then reduced to writing by Esquire Walker, and by the witnesses, Esquire Walker, Thomas Johnson, and the witness. Witness thinks this was done a few days after the death of the deceased. He has no doubt that the writing signed by the witnesses as above stated, and proven in the County Court, as the last will and testament of the deceased, was in reality such, and he believes the deceased was in sound mind, and thought he was making his own last will and testament. The deceased died at his own residence, and it was then that he made his will.

Thomas Johnson was examined on behalf of the defendants, and says: That in John Johnson's life-time, witness heard him say, that he wanted his property to go to his widow when he died, for her life-time, and if at her death she never married, and had no children, then he wished it to go to his and her brothers and sisters, to be divided amongst them equally. At the time the deceased made this declaration, he called on Robert Walker, James R. Lyon, and this witness, and it was during his last sickness, not more than five or six days before he died, as the witness thinks.

At the same time the deceased called on these witnesses to take notice, that this was his last will. This declaration was made at his residence. The will, a copy of which is exhibited and produced to the witness is, to the best of his recollection, a true copy of the declaration made by the deceased, about the time of his death, and to which, a witness testified in the Coun-

ty Court of Tuscaloosa County. The testamentary words were reduced to writing a day or two after the death. The deceased was in sound mind at the time the testamentary words were used, and was in great danger of dying very soon, at the time of the declaration. Witness believes that the testator thought that he was making a valid will, and was advised by the old man Walker, that it was valid and would stand. There was no influence exerted by any one, to induce him to make the will he made; it was his own free will. The reasons which he gave for making the will, were, that his wife and himself had made it with what she had at the time he married her. Walker, Lyon, and the witness were called on by the testator, to take notice, that the declaration he then made, was his last will. Cross-examined, he says, " Johnson was taken sick in August, but got well; he was again taken sick sometime in February, and was sick nine or ten days ;" but the witness is not certain as to the precise time. He was sicker on some days previous to making the declaration, than he was on the day when he made it. He was not better after making the declaration. He was out of his senses on one occasion, before making the declaration. He was very sick in August, but was not considered dangerous; his disease was of the eyes. The deceased first suggested the before named distribution of his property, as the witness supposes. Witness was in the room, and was requested to leave, for the deceased wished to have some conversation with his wife. Afterwards he was called on, and the declarations made. The deceased called on the witness, on Walker and Lyon, to take notice that this was his last will; he wanted Walker to send for Esquires Terrell and Whitfield to write his will, but Esquire Walker told him that this would do. Witness does not recollect whether this was before or after the distribution was made, but thinks it was before. Witness is a cousin of the deceased, and also a cousin of the defendant, Sarah Glasscock.

An affidavit made by Robert Walker, subsequently to his examination, bearing date in September, 1838, was submitted with the defendant's evidence. He deposes, that in his deposition before given, he made an unintentional error, to wit:

in said deposition, he said, when he answered as to the declaration made by the deceased, that the three subscribing witnesses to the will were present when the declaration was made, but the affiant upon more permanent reflection, says now, that he is certain as to the presence of two—himself and Thos. Johnson, but to as the third one, he is not positive. And he further states, that the then subscribing witnesses to the will in question, were present when the said will was reduced to writing.

An exemplification of the probate of the will in the County Court of Tuscaloosa County, was also produced in evidence by the defendants. So much of this, as is considered in the opinion of the Court, is in these words :

Be it remembered, that at a term of the Orphan's Court, begun and held for the County of Tuscaloosa, on the 31st day of March, 1834, present the Honorable Marmaduke Williams, Judge of said Court, the following order was made. On the application of John W. Foster, to have the probate of the nuncupative will of John Johnston deceased, taken, and letters testamentary on the estate of the deceased. And it appearing to the Court, that the deceased died without issue, and left no legal legatees of his estate, within the limits of this State, except Sarah C. Johnston, relict and widow of said deceased, and Jas. Cardwell. It is therefore ordered by the Court, that a citation issue to the said Sarah C. Johnston and James Cardwell to be and appear before the Judge of the said Court, on Monday the 7th day of April next, to contest said will, if they see cause. And at an Orphan's Court, held for said County, on the 7th day of April, 1834, the nuncupative will of John Johnston, deceased, was presented for probate, and it appearing to the Court by evidence, that said will was reduced to writing before the said testator died, and was read over to him a short time previous to his death, and that he was in his proper senses, and that Robert Walker, James R. Lyon and Thomas Johnston, were called on as witnesses, to testify that was his last will and testament. And it further appearing, by the oath of the said witnesses, that the said will was made in the time of his last sickness, at his residence, in the County of Tuscaloosa, and intended to be his last will. It also appearing, that

fourteen days have elasped since the death of the testator, and that due notice has been issued according to law, and also, that the said will has been reduced to writing, and here produced in Court to be established—it is therefore, &c. &e.

Here follows an order of probate, and for the appointment of Sarah C. Johnston and John W. Foster as administratrix and administrator, *cum testemento annexo.*

At the hearing, the Chancellor decreed that the bill should be dismissed, as he was of opinion, that nothing was shewn to impeach the validity of the will.

The complainants prosecute this writ of error, and insist that the decree should have been to set aside the probate, and declare the will invalid.

PECK, for the plaintiff in error, insisted,

1. That this will was void, because the *rogatio testium* was never reduced to writing. Lemann v. Bonsal, 2 Ecl. R. 147 ; Prince v. Hazelton, 20 John. 502; Mason v. Dunham, 1 Mum. 456.

The rules with respect to the ascertainment of the *facta* of nuncapative wills, are very different from those applicable to other wills, and the proof must make out a case of moral certainty in each of the statutory requisitions. Lemann v. Bonsal, *ubi sup* ; Bennet v. Jackson, 1 Ecl. R. 229 ; 2 Black Comm. 501, N. 1. 7.

2. A will of this description, to be valid must be made *in extremis* - 2 Black, Comm. 501, Swift, Ev. 420; Prince v. Hazelton, 29 John. 502 ; Sykes v. Sykes, 2 Stewart, 364.

3. The discrepancies in the testimony prove either, that the will is a falsification, or that it was obtained by fraud.

PHELAN, with whom was JOSHUA L. MARTIN and PORTER, for the defendants in error, contended.

1. That the bill is so entirely defective, as to present no issuable matter.

2. If the bill can be sustained on its face, the decree is without error, because no single allegation, which has been denied, is sustained by evidence.

3. Every allegation of the answer is sustained by the evidence, even if it is conceded that, to support a will of this description, the testator must be *in entremis,* Bouvier's L. D. 1 vol. 395 ; Roscoe's Crim. Ev. 24.

4. It is not necessary, however, that the testator should be *in extremis*. Prince v. Hazleton is not supported by any adjudicated case, and all the elementary treatises show, that at common law a verbal will was valid. The statute is a restraining statute, and the words, last sickness, must receive a reasonable construction. This question has never been raised in the Ecclesiastical Courts; Jackson v. Bennet, 1 Ecl. R. 229; 4 H. & M. 91, 98; Brayfield v. Brayfield, 3 Har. & J. 208.

5. The supposed discrepancies in the evidence cannot avail the complainants, because no question as to the execution of the will is raised by the bill. The only matters put in issue are.

1. That the will was admitted to probate without citation.

2. That the *rogatio testium* was wanting.

3. That the testator was of unsound mind.

The first is immaterial, and if true, does not vitiate the will; the last disproved by every witness.

As to the *rogatio testium*, it certainly cannot be necessary to reduce that to writing, in those cases where the will is not required to be so. It is only when a will is offered for probate, more than six months after the testator's death, that it must be shown to have been reduced to writing within six days—Digest tit. wills; Mason v. Denman, 1 Mun. 456.

6. If the complainants intended to put the execution of the will in question, they should have framed the bill accordingly. Story's Eq. 34; Gressly on Ev. 23; Story's Eq. 214; Bank U. S. v. Schulz, 3 Ham. 62; Morrison v. Hart, 2 Bibb, 4; Lemaster v. Burkhart, ibid. 26; Jackson v. Cartwight, 5 Mun. 314; Anthony v. Leftwich, 3 Rand. 263: James v. McKenon, 6 John. C. 564; Smith v. Smith, 1 Cowan 734; Morgan v. Crabb, 3 Porter 473; Bozman v. Draughan, 3 Stewart 246; Thomason v. Smithson, 7 Porter 154.

7. All the discrepancies arise, however, from the complainant's own evidence, which he cannot be permitted to contradict.

8. The probate in the County Court, is *prima facie* evidence of the will, and must prevail in the absence of testimony impeaching the execution.

GOLDTHWAITE, J.—1. In the course of the argument, it was insisted, on the part of the defendants, that many of the points relied on by the complainants, are not put issue by the allegations of the bill, and, therefore, ought not to be considered. The weight of the objection to the form of the bill, will be best ascertained by an examination of the statute, which gives to the Court of Chancery the jurisdiction of a contested will, and also by a consideration of the changes which this statute made in the law as previously understood.

The jurisdiction is conferred by the 55th section of the act of 1806. This provides that, " within five years from the time of the first probate of any will, any person interested in such will, may, by bill in Chancery, contest the validity of the same; and the Court of Chancery may thereupon direct an issue or issues in fact to be tried by a jury, as in other cases ; and in all such trials, the certificate of the oath of the witnesses, at the time of taking the original probate, shall be admitted as evidence to the jury, to have such weight as they may think it deserves; but, after the expiration of the said five years, the original probate of any will shall be conclusive and binding on all parties concerned; saving however, to infants, *femes covert*, persons *non compos mentis*, or absent from the territory, the like period of five years from and after the removal of their respective disabilities." [Aik. Dig. 450, S. 15.]

That this enactment extends the previously recognized jurisdiction of Chancery, is evident, because in England at this day the heir at law is not allowed to sustain a bill which seeks, merely to set aside a will of real estate. The reason why Chancery there declines jurisdiction of such a case, is, because the heir has a perfect and complete remedy at law, by the action of ejectment, in the defence of which the devisee derives no aid whatever from the probate of the will before the Ecclesiastical Court. Jones v. Jones, 3 Merrivale 161 ; So, likewise, a bill is never entertained to set aside a will of personal estate, but the parties interested, are left to contest the probate in the Ecclesiastical Courts. Archer v. Morse, 2 Vern. S; Sheffield v. The Duchess of Buckinghamshire, 1 Atkyn's 630 ; Plume v. Bulle, 1 P. Wms. 388 ; The cases in

20

which the heir at law, and next of kin, are permitted to go into Chancery, are those in which it is necessary to apply for an injunction, or for the appointment of a receiver, to prevent waste or avoid injury, during the pendency of the contest in the proper Courts; but the final decree, even in such cases, is always predicated on the result of the controversy in those Courts. [Andrews v. Powis, 2 Bro. P. C. 476; Jones v. Jones, 3 Merrivale 176.] It is true, that the jurisdiction of Chancery to set aside a will for fraud, was formerly asserted and acted on, by some English Chancellors, but it is believed to have been uniformly disavowed since the case of Kenrick v. Bransley, 3 Bro. P. C. 358, in which a decree of Lord Chancellor Macclesfield, setting aside a will for fraud, was reversed by the house of Lords, for the reasons, that the validity of the will could not be determined, as to personal estate, in the Ecclesiastical Courts, and as to real estate, by the Courts of common law. See, also, the cases collected by Mr. Fonblanque. Trea. on Eq. Book, 1, Sect. 3, note U., and the case of Mariott v. Mariott, 2 Strange 606.

But, notwithstanding, the Court of Chancery declines the power to determine the question of will, or no will, it is the common practice in England, to go into that Court to establish a will of real estate against the heir at law ; and after the validity of the will is tested by the trial of an issue *devisavit vel non*, the decree is predicated on the result. This jurisdiction, however, is exercised, as in bills of peace, to suppress interminable litigation, and to give security and repose to titles. [2 Story Eq. 672.

Undoubtedly, the devisee in England, may establish his title by an action of ejectment; but in this, as in an issue of *devisavit vel non*, he is bound to establish the will under which he claims, by witnesses, because the probate gives it no effect as to real estate.

As to personal estate, the will derives its potential force solely from the probate, without which the executor is unable to sustain an action. This probate, by the practice of the Ecclesiastical Courts of England, may be in two forms, of which one is called the *common*, the other, the *solemn* form. The first is, when the will is not contested, then, the executor may

Johnston et al. v. Glasscock & Wife et als.

prove it by his own oath; the latter is, when the will is controverted, and the proof is then, by witnesses examined as in a contested suit. Swinburne, 448, 449; 4 Burns' Ecl. Law, 171, 172. The difference in the forms of proving the will is, that if it is proved in common form only, the executor can be compelled, by the next of kin, to prove it in solemn form, at any time within ten years, according to Swinburn, and thirty years, according to Goldolphin, who considers the text of Swinburne, as a misprint. Swin. 449; God. 0. L. 62 ; 4 Burns' Ecl. L. 171, 172.

From this statement of the law, as it existed unaffected by statutes, it will be seen, that there were many and important distinctions between wills of real and personal estate, both with respect to the *manner* by which they could be established, and the *mode* by which they might be controverted. Our statute of 1806, seems to have been intended to provide a common mode, by which wills, of either description, may be established in the first instance. This view is strengthened by recurring to its 12th and 15th sections; the former of which, authorises the probate of the will in any country, where the *lands devised* are situate, when the testator had no known place of residence within the State ; and the latter provides for the custody of the will, after its probate, in the Register's office. Both of these clauses are incompatible with the idea that no change was intended as to wills of real estate and the latter seems to be conclusive, that a copy of the will, with the probate, may be used as evidence in other Courts.

2. The 55th section of the statute also provides a new mode, by which the heir at law, or the next of kin, can contest the will in such a manner, that one suit will be conclusive and final ; and for this purpose, has invested the Court of Chancery with the jurisdiction, authorising it to call in aid the assistance of a jury, *as in other cases.*

3. The last change, introduced by the section, is, to provide a period of limitation, much shorter than before was known, after which the will admitted to probate, ceases to be the subject of controversy and becomes entirely conclusive on all parties interested.

4. If the probate first obtained, is to be *prima facie* evidence of the validity of the will when subsequently contested, then it is evident that the heir at law, and next of kin, would be placed in the peculiar position of being called on to establish a negative, which always would be highly impracticable, and, oftentimes, wholly impossible ; but such a construction is not called for by any clause in the statute, and is, impliedly, at least, contradicted by the provision, that the certificate of the oath of the witnesses, shall be evidence before the jury on the trial of an issue, *to have such weight as they may think it deserves.* The opportunity afforded by the statute, to the heir at law, and next of kin, or others concerned in the will, *to* contest it in Chancery, after it has been admitted to probate in the County Court, seems to be given in place of the *proof in solemn form,* as previously practiced in the Ecclesiastical Courts, when the will was of personal property, and of the action of ejectment in a Court of common law, when the will was of real estate.

5. This being, in our opinion, the proper construction, the investigation in Chancery, must be governed by the same rules and laws which prevailed in similar investigations in the other Courts, which have been named, *except so far as the statute provides a new rule.*

6. In either of these Courts, the person claiming under the will, is placed in the situation of an *actor,* and is bound to support the will affirmatively. It is true, that, under the statute, we are considering, the heir at law, or next of kin, is, necessarily, the complainant; but his condition is such, that, after establishing his heirship or kinship, he occupies precisely the same position as the heir at law, when he is the plaintiff in an ejectment, or the next of kin, when he seeks to call in the probate, in common form, of a will. Such being the condition of a complainant under the statute, nothing is necessary in his bill, more than to alledge the title, by which he has the right to investigate the probate, and a prayer for relief. If he requires a discovery, or the circumstances of the case require an injunction, or the appointment of a receiver, the bill may be framed with a view to such circumstances. The bill now before us contains the necessary matter to conform to this view, and

therefore, is considered sufficient to put the defendants on proof of the will.

The answer very properly avers every fact and circumstance, which is considered, even by the complainant's counsel, necessary to constitute a good nuncupation, if we except the *rogatio testium*, which, although averred in the answer, is not stated in the will, as reduced to writing.

7. Whether this is required to be committed to writing, *as a part of the will*, is next be to be examined; but, before proceeding to this point in the case, it may be proper here to remark, that we do not decide that probate of a will is necessary to enable a devisee to maintain or defend an ejectment. It is apparent, that no such question is presented by the facts of this case, and there are many views connected with it, which render it important not to be discussed, untilinvolved in some case actually before the Court, We may add, that the question adverted to, has been decided by the Court of Appeals, of Virginia, in Bagwell v. Elliott, 2 Rand. 190 ; and in which case a construction is given to a body of statutes not materially variant from our own.

8. It is very clear, by the terms of the statute, that the validity of a nuncupative will does not depend on the fact of its being reduced to writing, either before or after the death of the testator, *unless* the probate is deferred for a longer period than six months, after the words were spoken. The fifth section of the act of 1806, directs " that, after the expiration of six months from the time of speaking any pretended testamentary words, no testimony shall be received to prove the same to be a nuncupative will, unless such words, or the substance thereof, were reduced to writing, within six days after speaking the same.

If then, the testimony is received within six months, there is nothing which prohibits the establishment of the will, although it may never have been reduced to writing. If the objection of the complainant's counsel to the will, on this ground, is good for any thing, one cannot fail to perceive, that it goes to the whole will, and not merely to the omission to commit the *rogatio testium* to writing, because, the evidence in the Court of Chancery, was taken after the expiration of six months, and the will, certainly, was not reduced to writing, within six days after

the words were spoken; the original probate was had, however, within six months after the speaking of the testamentary words. From the section which we have just now recited, some may suppose, that it was intended never to permit any evidence to be given, respecting any nuncupative will, after the expiration of six months; but such a construction would be manifestly absurd when applied to the provisions of the fifty-fifth section ; because, it is evident, that a nuncupative will may be proved *within* six months, although it may not have been reduced to writing, within six days after the words were spoken. Therefore, if the literal terms of the fifth section must be conformed to, and no evidence can be given after six months, in such a case, the next of kin has only to wait the expiration of this period, and then he can successfully contest the will in Chancery, which was previously properly admitted to probate in the County Court. This would be in effect, to change the enactment, and make it, that no nuncupative will shall be valid, unless reduced to writing within six days after the speaking of the testamentary words. When these two sections are considered together, no other construction can be given, than that the proof when the contest is had under the fifty-fifth section, shall be of the same quality and degree, (except so far as other evidence is authorized by the same section) as was proper, when the probate was had in the County Court.

This necessarily disposes of the question raised, with respect to the omission to reduce the *rogatio testium* to writing, as a part of the will, because it was unnecessary, under the statute, to reduce any part of the will to writing, the probate having been made in the County Court within six months after the speaking of the words; therefore it is a matter of no importance to consider, whether the *rogatio testium* is or is not a part of the will, and necessary to be written when the will is so required to be.

9. Should this question ever properly arise, it will be well to consider the marked distinction which exists between the 5th section of the act of 1806, and the 20th section of the English statute of frauds, which provides that no *testimony* shall be taken after six months, to prove any nuncupative will, except the *testimony* or the substance was committed to writing.

We also remark, that, we do not understand it to be controverted, that the proof of the *factum* of a *rogatio testium*, is the same as it is to the testamentary words.

10. The next objection is, that the will was not made *in extremis;* and it is insisted that the words, *last sickness,* in the statute, must receive this construction.

The case of Sykes v. Sykes, 2 Stewart, 459, has been cited, as a decision of this question, by our own Court. We find, however, on looking into it, that this question did not arise from the facts; neither was it raised, or necessary to be determined. Therefore the opinion, however much we respect the learned Judge who pronounced it, can only be considered as an *obiter dictum,* and we are consequently constrained to examine the point, as one entirely new in this State. If, before the enactment of the statute for the prevention of frauds and perjuries in England, it was necessary to the validity of a nuncupative will, that it should have been made whilst the testator was *in extremis,* then, it is clear that the same construction ought now to be put on the words, *last* sickness, because, that is certainly a restraining, and not an enabling statute. If such a construction has been given to it even in England, perhaps it should be followed here, because the terms of our own statute are evidently borrowed from it.

But it seems to be considered by Chancellor Kent, in the case of Prince v. Hazelton, 20 John. 511, that unwritten wills were, by the common law, as anciently held, for he says, after quoting Perkins & Swinburn to sustain his own views of the law, "I do not infer from these passages, that unwritten wills were always bad at common law, unless made in a case of extremity, when death was just overtaking the testator. In ignorant ages there was no other way of making a will, but by words and signs; reading was so rare an accomplishment, in the earliest ages of the common law, that it conferred great privileges, and the person who possessed it, was entitled under the name of *benefit of clergy,* to an exemption from civil punishment. But these ancient writers mean to be understood that, in the ages of Henry the 8th, Elizabeth and James, letters had become so generally cultivated, and reading and writing so widely diffused, that nuncupative wills were *properly,* according to Per-

kins, and *commonly*, according to Swinburn, confined to extreme cases; and to be justified only upon the plea of necessity." It seems to us, that this concession puts the question to rest, for if this once was the common law, what right have Courts to change it? If Courts possess this power, why was there any necessity to enact the statute of frauds, when the same end might have been attained, by the Courts declaring that the old law was inexpedient, and not suited for the people in their more enlightened condition? But, in truth, the Courts of England have never advanced this doctrine; nor, so far as we can ascertain, has it ever there been held in any decided case. Indeed, the current of decision in the Ecclesiastical Courts, (the only Courts in which this question could there arise) goes very far to sustain a different view; for it is common, in those Courts, to prove instructions for a will, *as a will*, if they be reduced to writing in the testator's life time, and the formal execution or completion of the will, is prevented by the act of God; and this, even in cases, when the circumstances would not bring the will within the statute of frauds, if considered as a nuncupation. [Sanford v. Vaughan, 1 Phil. 37; Green v. Skepworth, ibid 53; Devereaux v. Bullock, ibid 60.

The same rule applies to an unfinished and unexecuted paper, when the finishing and execution are prevented by unexpected death. [Scott v. Rhodes, 1 Phil. 12; Bone v. Spear, ibid 345; Wood v. Wood, ibid 357; Rockett v. Goade, 3 ibid 141; Jameson v. Cook, 1 Hagg. 82; Lumkin v. Bibb, 1 Lee, 1.

These cases do not rest on the ground, that a good nuncupative will has been made, but the instructions, or the unfinished and unexecuted papers, are established as *written* wills. They are the only cases to be found in the reports of the Ecclesiastical Courts, in which the *extremity* of the testator's life, makes a difference in the decision of the judges.

The total absence of any case at Doctor's Commons, on this precise point, is very persuasive to show, that no such rule as was decided in Prince v. Hazleton, is there recognized as law. There is, however, one case reported in which the question could, and probably would, have been made if the law, be as it was held to be by Chancellor Kent.

In Jackson v. Bennett, 2 Phil. 90, the pretended nuncupation was made on the 29th April, and the death occurred on the 10th May. The allegation of the will was rejected, because of the omission of a sufficient *rogatio testium*. That point in the case, must have been subsequent to that of the last sickness, or *in extremis*. In the report it is stated, that the will was made at the dwelling house of the deceased, and *in his last sickness*. It is also said, that the deceased summoned several of her children to her bed-side when she spoke the nuncupatory words. After making the declaration, she observed that it should be committed to writing; but afterwards said, that the witnesses hearing it, would answer the same purpose. She afterwards asked one of the persons, who were present shortly before the words were spoken, why she left the room, as she wished her to witness what she had to say to her children.

The circumstances, certainly tend to show that the testatrix was not *in extremis*, in the ordinary sense of that term, and as signified by Perkins. She was sick and doubtless expected to die of that sickness, but the inference, that there was ample time and capacity to execute a written will, is well warranted from the facts which are stated. It is true that this was not a contested case, but it is scarcely possible that Sir John Nichol would have rejected the allegation for the want of a sufficient *rogatio testium* if the laws of England only authorized the testatrix to make a nuncupative will when *in extremis,* and that too, when the reverse of a case of extremity appeared from the facts alledged. It must be admitted to be a singular and most extraordinary circumstance, if it was ever law, that a verbal will might be made of personal estate, by one not in the extremity of illness, that this law should have been silently changed, and yet no trace of the change exist in the records of judicial decisions. None of the elementary writers who are quoted by Chancellor Kent, refer to a single decided case, in which the rule has been laid down, even if any of them go to the extent of stating it to be so. Blackstone indeed seems, on the contrary, to admit that such wills may be made; for, after showing how far they have been restricted by the statute of frauds, he says *"the thing itself has fallen into disuse, and*

*is hardly ever heard of, but in the only instance in which
favour ought to be shown to it—when the testator is surpris-
ed by sudden and violent sickness."* [2 Comm. 501.] It
may be, that these wills have fallen into disuse, and very pro-
perly so; but there is no good reason when they are made, in
the manner permitted by the statute, that Courts should refuse
to allow their validity.

If a person in his last sickness—that sickness of which he
subsequently dies,—impressed with the probability of ap-
proaching death, deliberately makes his will, conforming to the
statute, we do not feel authorized to say that it will be inva-
lid, because, in point of fact, he had time and opportunity to re-
duce it to writing.

11. In such a case, however, the evidence ought to be of
such weight, as to leave no doubt on the mind of the judge
or jury, that the will offered for probate, was in truth, the will
of the deceased; and undoubtedly, whenever a will is so made,
the Court must be more on its guard against importunity,
more jealous of capacity, and more strict in requiring proof of
spontaniety and volition, than it would be in an ordinary case.
But if there is clear capacity, if there is the *animus testandi,*
if it is made at the residence of the deceased, if the witnesses
or some of them are called on by the testator, to take notice
that it is his last will, the Court must pronounce for it, if it is
proved within six months, or afterwards, if reduced to writing
within six days after the speaking of the testamentary words.

12. These conclusions bring us, at least, to the examination
of the evidence, by which this nuncupation is sought to be
proved; but, before entering on its consideration, it is proper
to ascertain what number of witnesses are necessary to estab-
lish a will of this description. The statute makes three wit-
nesses necessary when lands are devised, but it is entirely silent
with respect to the number which is required to validate a
nuncupative will, though, it may be inferred, from the terms
*"persons present or some of them,"* that more than one are
necessary to all its parts, except the *rogatio testium.* As the
statute prescribes no rule, we are necessarily thrown back on
the previous law for the rules to govern our determination.
The common law, properly so called, never contained any

rules with respect to wills of personal estate. It is true, that the course of proceeding in the Ecclesiastical Courts, was engrafted on and recognized as a part of the common law, [1 Black. Comm. 79.] but this course of proceeding was in accordance with the civil and canon laws, unless where those were changed by act of parliament. [ibid 84.] It is evident that, in this country, we must either resort to the same laws to ascertain how such wills may be made and proved, or we are thrown on the wide ocean of discretion, without compass or chart to guide us. A similar view is taken by the Court of Appeals of Virginia, in the case of Redford v. Peggy, 6 Rand. 315. That Court considered the practice and laws governing the Ecclesiastical Courts of England, as having been adopted by the colonist of Virginia on its settlement. The same doctrine obtains in Pennsylvania, Lewis v. Morris, 1 Dall. 278, and is believed to prevail in all the States, (in the absence of legislative enactments) where the common law furnishes the rules of decision.

13. By the civil and canon law, two witnesses, in general, are necessary to establish a will; and this is the rule which prevails in the Ecclesiastical Courts in England. [Twaits vs. Smith, 1 P. Wms. 13; Redford vs. Peggy, 6 Rand. 316.] As two witnesses are thus shown to have been necessary previous to the enactment of the statute, it follows that the same number is now requisite, whether their testimony is to be given before the probate court, or the court of chancery.

14. The first evidence, in point of order, is the record of the proceedings had when the will was admitted to probate in the County Court. The 56th section of the statute, as we have seen, provides that the Court of Chancery may direct issues of fact to be tried by a jury, as in other cases; and that, in all such trials, the certificate of the oath of the witnesses at the time of the taking the original probate, shall be admitted as evidence to the jury, to have such weight as they may think it deserves. It is true, that the terms of this clause extend only to the admission of the certificate *as evidence to the jury*, but its spirit extends, equally, to an investigation before the Chancellor; otherwise, it might be that there would be no proof whatever in the one case, and full proof in the other.

15. This section of the statute was, doubtless, intended to protect persons, claiming under a will, against the *impossibility* of establishing it, if the witnesses were to die, after the probate, but before the contest in chancery; and from the *difficulty* of so doing, when, after the probate, they could not be found. The intention of the section will be best carried into effect, by considering the examination of the witnesses at the time of the probate, as an examination in chief, leaving it to those who subsequently contest the will, to cross examine the witnesses, if they deem it important or necessary to do so. This construction prevents the statute from working injustice to either party in the contest. Those propounding a will ought not to be required to prove it again, and after a lapse of time, when the witnesses may be dead, or may have removed away; and, on the other hand, those contesting it, ought not to be placed in a condition where they would be called on to establish a negative; nor ought they to be embarrassed by being compelled to make the witnesses formerly sworn, their own witnesses by a subsequent examination. The witnesses are the witnesses to the will, and ought not therefore to be subject to the cross examination of those who deny its validity. Bootle vs. Blundell, 4 Vesey, 509. All of the witnesses who proved the will at the probate, have subsequently been examined by one or the other of the parties, and, therefore, it is unnecessary, at this time, to examine what was then stated by them; for it is certain the examination of both parties, will produce testimony more satisfactory than one which is *ex parte.*

We proceed, then, to the examination of the testimony of the witnesses, with respect to the execution of the will.

[Here the Court recapitulated the testimony given by the witnesses, for which see the statement of the case.]

16. The rules in relation to the evidence requisite to prove a nuncupative will, are thus stated by Sir John Nickell, in the case of Lemann vs. Bonsall : 1 Addams, 389. " Nuncupative wills are not favorites with courts of probate ; at the same time, if duly proved, they are equally entitled to be pronounced for, with written wills. Much more is requisite, however, to the proof of a nuncupative will than of a written one, in several particulars. In the first place, numerous restrictions are im-

posed on such wills by the statute of Frauds, the provisions of which must be, it is held, strictly complied with, to entitle any nuncupative will to probate.   But, added to this, and independent of the statute of Frauds altogether, the *factum* of a nuncupative will requires to be proved by evidence more strict and stringent than that of a written one, in every single particular. This is requisite, in consideration of the facilities with which frauds, in setting up nuncupative wills, are obviously attended—facilities which absolutely require to be controverted by courts insisting on the strictest proof as to the *facta* of such wills.   Hence the testamentary capacity of the deceased, and the *animus testandi*, at the time of the alleged nuncupation, must appear by the clearest and most indisputable testimony; above all, it must plainly result from the evidence, that the instrument propounded, contains the true substance and import, at least, of the alleged nuncupation; and, consequently, that it embodies the deceased's real testamentary intentions, though not so reduced to writing, during his or her life, as to be capable of being propounded as a written will.   For, unless the court is morally certain, by pronouncing for it, of carrying them, and no other, into effect, it is obviously its duty not to give any alledged will, much less a nuncupative one, the sanction of its probate."

Judging the evidence by these rules, it may be questionable whether the testimony given by Walker and Johnston, would authorise a court to establish this will, even if their statements stood uncontradicted and alone.

The intrinsic evidence arising out of the deposition of Walker, is very strong to induce a doubt of the *execution* of the will.   He admits that the deceased wished to *write* his will, which the witness declined on account of not writing well; that through his negligence the writing was deferred for two or three days, after which time the deceased was advised by some of his visitors of the manner in which a verbal will could be made.   When the will was made, the deceased requested the witnesses to commit it to writing.   This witness was solemnly impressed with the idea that it was intended by the deceased as his will, and yet he neglects to comply with this request, until some days after the death, when this bad scribe,

as he terms himself, did that which he refused to do for the deceased at the commencement of his sickness. Again, he says, he examined *Hitchcock's Justice,* or the *Laws of Alabama,* with regard to the requisites of a *nuncupative will,* and thinks he informed the deceased of them at the time the will was made. Now, *Hitchcock's Justice* does not contain a single rule with respect to a nuncupative will, and the *Laws of Alabama* would have informed the witness that real estate could not pass by such a will, even if it is conceded to be probable, that one, who admits his incapacity to write a will, could gather from the statute the meaning of a nuncupative will.

Then, also, the *date* of the will, as it appears in the writing propounded, is very unlikely to be the true date at which it was reduced to writing. The deceased died on the morning of the 6th day of March, on which day the will is dated. It was made, if made at all, several days before that time, and this witness says he committed it to writing *some days* after his death. On the examination, he states that James Lyon was present, and was likewise one of the witnesses called on ; afterwards, and when Lyon has contradicted this statement, he says, that on more permanent reflection, he is certain that himself and Johnston were called on and were present. Can we be certain, that on still more reflection, this witness may not arrive at a recollection that such a will was spoken of, but never made with the forms which the law requires?

Some of the facts which this witness states, are not consistent with each other. If books were examined to ascertain how a nuncupative will might be made, it is unreasonable to suppose that, when examined, the witness should not have learned from them, that real estate could not be devised in this way. Again, it is not a little strange that individuals should visit the testator, and be capable of advising with the utmost precision and exactness, to the manner in which he could make a *verbal will,* and yet, not be capable of *writing one,* but the witness says, he does not know that any person competent to write a will visited the deceased in his last illness.

Facts are also stated by this witness, which, if they ever existed, could easily have been proved in corroboration of his testimony, which it must have been evident, it was essential to

support after the examination of James Lyon; and, more espe-
cially, after the record of the probate was looked into.    Thus,
the witness says, that the deceased was advised by *two or three*
persons, *in the presence of those who were visiting*, of the man-
ner by which a verbal will could be made.    Again, when the
will was made, the witnesses were informed of the purpose for
which he had requested their attendance, and *all other persons
present, were requested to withdraw from the room.*

When we look into the record of the probate, we there find
a statement, evidently framed with much caution, and which is
most extraordinary, when taken in connexion with the facts eli-
cited on the examination of the witnesses.    The statement in
the record is, " that it appears to the Court by *evidence,* that
the will was reduced to writing, *before* the testator died, and
was *read* over to him a short time before his death, and that he
was in his proper senses, and that Robert Walker, James Lyon,
and  Thomas Johnson, were  called on as· witnesses to  testify
that was his last will and testament.    And it further appearing
*by the oath of the said witnesses,* that the  said will was made
in the time of his last  sickness, at his residence,  in the county
of Tuscaloosa, and intended it to be his last will."    How does
it happen, that certain  facts making this  a *written will* of the
deceased, and one too, *possibly,* passing his real estate, *appear-
ed by evidence,* whilst certain other facts are stated, as appear-
ing by the oath  of the named witnesses, who now testify to no
one of the facts, then said to be shewn by *evidence?*    There is
also, a strong apparent connexion, between the *date* of the will
as propounded, and the fact, alledged in  the record of  probate,
that the will was read over to the deceased, a *short time* before
his death.    He died on the morning of the sixth of March; the
will  bears that date,  and was, as has already been shewn, nei-
ther made, nor reduced to writing at that time.

The evidence now  before the Court,  shews, that when the
will was made, it was known,  by the principal witness, to be a
nuncupative will : yet, on its face, it disposes of the real estate,
and the *evidence* before the probate Court, was  calculated and
possibly intended, to make it so operate.

17.  The statute makes the statement in  the record evidence ;
it is the certificate of the oath of the witnesses, and it is to have

such weight as it may be entitled to. It weighs most heavily against those setting up this will, and its effect could only have been counteracted by shewing, that no such evidence was given, and by accounting, most clearly, and satisfactorily for the, in that event, false language of the record.

18. The rule is perfectly well established that, when a will is impeached on the ground of fraud, the parties who seek to establish it, must remove or explain, and so neutralize the facts out of which the suspicion arose. (Wyatt v. Ingram, 3 Hagg. 466.) And this rule is held to apply, also, to fraudulent acts in relation to the obtaining of probate. (Ingram v. Wyatt, 1 Hagg. 389.) No attempt has been made to do away the strong presumptions, which arise from the statements of the record of the probate, as to what was then proved when taken in connexion with the facts, as shewn by the witnesses; or to support the testimony given by Walker and Johnson, against the direct and positive declaration of James Lyon.

It is impossible to believe, in the absence of evidence leading to such a conclusion, that the entry in the records of the County Court, was made by mistake, or at random, without design. Nor can the testimony given by the witnesses, be reconciled on any reasonable hypothesis.

Our duty under such a state of proof, and the presumptions which the law attaches to it, is sufficiently performed, by declaring, that the will is not sufficiently proved.

The decree of the Chancellor is accordingly reversed, and this Court, proceeding to render such decree as should have been rendered, doth order and adjudge, that the probate of the will of John Johnson, deceased, heretofore admitted to probate in the County Court of Tuscaloosa County, be set aside and held for naught.

It is further ordered and adjudged, that the estate of the said John Johnson, be distributed as in case of intestacy, and that the defendants, Glasscock and Wife, be declared trustees for those entitled to distribution; and that the case be remanded to the Chancery Court, in order that an account may be taken, and distribution made.

It is further ordered and adjudged, that the defendant Glass-cock, pay all the costs of this Court, and the Court below, to be charged by him against, and paid out of, the funds of the estate.

[*After the foregoing opinion was pronounced, further proceedings were had, as follows.*]

1. After a decree in Chancery, sustaining the probate of a nuncupative will, has been reversed by this Court, and a decree rendered, setting aside the will as not satisfactorily established, the case will not be remanded, to let in further evidence to explain discrepancies in the evidence.

AFTER the opinion in this case was delivered, the counsel for the defendants in error, petitioned the Court for a re-hearing; and, if the re-hearing was refused, for such a modification of the decree, as to permit new evidence to be taken in the Chancery Court, to explain the supposed discrepancies in the evidence.

The Court refused the re-hearing, but directed the other point to be argued at bar, on the affidavits submitted.

The affidavit of Joshua L. Martin stated, that he attended the examination of the witnesses on behalf of the defendants below. That he was then ignorant of the state of the record of the probate in the County Court, and consequently, the examination was not directed to the explanation of the apparent discrepancy of the statements of the witnesses. That he believes he never saw the record of the probate, until the day when the hearing was had.

The affidavit of Robert Walker states, that he never gave the testimony before the County Court which is stated in the record of the probate, and he is satisfied that none such was given by Lyon or Johnson, the other witnesses; as all were

21

present, and heard what the others swore. He also states, that he reduced the words to writing, on the evening after Johnson was buried, who died on the sixth, and was buried on the seventh of March, 1834. The day after, a copy was made by Moses.P. Walker, which the witnesses signed. He cannot remember why the written memorandum was dated the 6th of March, if it was not a mistake as to the date; for that was not the true time when the words were reduced to writing, which was the 7th, and signed by the witnesses on the 8th.

James R. Lyon swears, that no such testimony was given by him, nor did he hear any such given by the other witnesses. He is confident that no such testimony was given, and is persuaded that the entry is by mistake of the clerk. He has an intimate knowledge of all the parties·connected with the transaction, and believes Walker and Johnson to be men of unimpeachable veracity.

Moses P. Walker swears, that he made a copy of the original draft of the will, which was drawn by his father, Robert Walker. To the best of his recollection, the copy was made on the morning of the 8th of March, which was the day after Johnson was buried; and the copy was then signed by the witnesses, who all concurred in the correctness of the will, as drawn by Robert Walker.

M. D. Williams, Judge of the County Court of Tuscaloosa County, states, that he has examined the Clerk's minutes of the probate, and is persuaded the statement therein contained, must have arisen from the mistake, or misapprehension of the Clerk ; for he has a clear recollection of the case, and of the testimony of the witnesses. and is quite sure, that neither of them testified that the will had been reduced to writing before Johnson died. From conversations had with Robert Walker, before and at the time of the probate, he understood the will was reduced to writing after Johnson's death ;.and such, to the best of his recollection, was the testimony of the witnesses, when the will was proven. He does not remember to have seen the entry, after it was made, until lately, when it was called to his recollection; and he is fully impressed with the belief, that the Clerk made an unintentional error in the entry. He is acquainted with Robert Walker, and no man stands higher for truth and veracity.

He says the same of Lyon, and that Johnston has the character of an upright man.

Moses McGuire, the Clerk of the County Court of Tuscaloosa County, states, that his attention has been called to the entry of the probate of John Johnston's will. His first impression was, that the entry was made pursuant to the testimony given by the witnesses; but, being informed that Walker and Lyon, both of whom he knows to be men of veracity, have made affidavit that they did not give testimony to that effect, at the probate of the will, and that the fact was otherwise, as to the reducing of the will to writing, before the death of Johnston—and finding, also, on turning to the minutes of the Court, that on the same day two other nuncupative wills were admitted to probate, besides Johnston's, one of which precedes the entry of Johnston's, which immediately follows; and the entry of the first is in the precise language, (in the particular of having been reduced to writing before the death) of the entry in Johnston's will. His attention has also been called to the fact, that the will commences with, "I, John Johnston," using the first person. From these circumstances and considerations, McGuire says it is possible there may have been an unintentional error committed by him, in making the entry in the minutes of the probate.

PHELAN, for the petition, cited More et al. v. Caldwell, 12 Pick. 525; 9 Pick. 426; 2 B. & A. 971; Hood v. Pimm, 4 Sim. 101; Digest, 237; Story's Eq. 336, and notes. Cox v. Allengham, Jacob, 337; Williams v. Goodchild, 2 Russ. 91; Gresley's Eq. Ev. 410; ibid, 133.

PECK, contra, cited Hammersley v. Lambert, 2 John. Ch. 432; Gresley's Ev. 135; Durham v. Winans, 2 Paige, 24; Dale v. Roosevelt, 6 John. Ch. 255; Gray v. Murray, 4 Johns. 412; Rawley v. Adams, M. & K. 543; Earle v. Pickin, R. & M. 547.

GOLDTHWAITE, J.—We do not conceive it necessary to examine, whether this Court has the discretion, in any case after a reversal, to remand it, for the purpose of permitting the parties to go into a re-examination of witnesses. If it is admitted we can do so in some cases, we do not consider that the discre-

tion would be properly exercised, under the circumstances attending this case.

The evidence, as we have shewn in the opinion heretofore pronounced, is not satisfactory to establish the will, and the question now is, could it be made satisfactory, consistently with the rules governing Chancery practice. The evidence contained in the record is not merely defective; there is no omission to prove a particular fact, or a writing, on which the case depends, as in the case of Hood v. Pimm, 4 Sim. 101. But the evidence adduced is inconsistent in its several parts; and, it is from an examination of each part, compared with all the other parts, that we have concluded that the will is not sufficiently established. In cases of this description, it is necessary that the Court should be convinced to *a moral* certainty, that the will propounded, is the true will of the deceased, and that every requisite of the statute has been strictly complied with. If the case was sent back and opened for the admission of new testimony, although it might be made stronger, yet the old evidence could not be expunged, and we should be called on to determine which presented the true, and which the mistaken, view of the facts.

It is sufficient to determine us to refuse the petition, that if this motion had been addressed to the Chancellor after the decree, it should not have been allowed; because, to use the words of Chancellor Kent, in the case of Gray v. Murray, 4 Johns. Ch. 412, there never was a re-examination permitted, merely to alter and correct testimony, after the cause had been heard and discussed, and decided on the very matter of fact, to which the testimony referred. It would be setting a most alarming precedent, and would shake the fundamental principles of evidence in this Court.

In the case of Maury v. Mason, 8 Porter, 211, we refused to dismiss a bill, without prejudice to another suit, when the witness, on whose testimony the case depended, was interested, and it was wished to render him competent by a release.

We are satisfied, that it would be a most dangerous innovation in the course of Chancery proceedings, to entertain and allow this petition.