## MARIA J. HUBBARD *vs.* ELIAS HUBBARD.

Where a mariner, while actually at sea, and during his last illness, and within an hour of his death, in answer to the inquiry, what disposition he wished to make of his property? replied, "I want my wife to have all my personal property;" such declaration being made in the presence of four witnesses, and the testator being of sound mind and memory, at the time, and under no restraint; *Held* that this was a good nuncupative will.

The right of a soldier in actual military service, or of a mariner at sea, to make an unwritten will, is not an unqualified right which may be exercised under all circumstances. As the making of such wills can only be justified upon the plea of necessity, so they will only be tolerated when made *in extremis*.

THIS was an appeal to the supreme court, at general term, from the decision made by Justice McCoun, at the special term held in Suffolk county, in September, 1850, whereby he reversed, for error in law, the decision of the surrogate of Suffolk county, made the 18th of September, 1849, upon the application of the appellant, admitting to probate the alledged nuncupative will of her husband, William L. Hubbard, of Greenport, Long Island, and granting to her letters of administration therewith.

On the hearing before the surrogate it appeared, from the testimony of four witnesses, that the testator was master of the schooner Oregon, of Greenport; that on the 5th of July, 1849, the vessel, loaded with coal, lay at anchor inside of the breakwater, at the mouth of Delaware Bay; that the testator was at that time on board of the vessel, sick with the cholera, of which disease he died about five o'clock in the afternoon; about three o'clock the same afternoon, he was asked by Sherbourne Beckwith, the mate of the vessel, and who was also one of the witnesses to the will, what he should tell the testator's wife, provided the testator did not get home? His reply was, "Tell her I loved her till the end." When asked if he had a will? He said, No, that he had had one, but that it was destroyed. He was then asked by Beckwith, what disposition he wished to make of his property. He replied, "I want my wife to have all my personal property." Beckwith then asked him if he wished her to have his real property too, and he replied "Yes, all." The three other witnesses who were examined before the surro-

Hubbard v. Hubbard.

gate, viz. Ira T. Horton, master of a vessel then lying near the Oregon; James S. Beebe, mate of the schooner Samuel McDowell; and David Brown, a hand on board of the Oregon, severally stated that they were present when Beckwith put the questions to the testator, as to his message to his wife; whether he had a will, and what disposition he wished to make of his property; and that they heard him give the answers as above stated. They all testified that the testator was of sound mind and memory at the time, and was under no restraint. One of the witnesses, (Brown,) also testified, that about five or ten minutes after the testator had so declared his will, George Merrill (who was also a hand on board the Oregon) asked him if he knew him; and he answered, "Yes, I know you George." It was also proved, that the nearest part of the main land was within a mile of where the vessel was lying; that there were 100 or 150 other vessels lying at anchor at the same time: that the tide ebbs and flows where they lay, about six feet; that the bay there is about 18 miles wide, from Cape May to Cape Henlopen; and that there was a physician on board the Oregon, that day; that he was sent for by Mr. Beckwith, from the town of Lewis, about three miles from where the Oregon lay, and came on board about eleven o'clock, but did not stay until the testator died. It was also proved that the testator was taken with the cholera about nine o'clock in the morning of the 5th of July, 1850, the day that he died; but that he had been complaining for two or three days.

The surrogate, on this testimony, decided that the nuncupative or unwritten will of the said William Hubbard, deceased, was duly made and published according to law, and that the same was genuine and valid, &c. and admitted the same to probate, and granted administration, with the will annexed, to Maria J. Hubbard, the widow of the deceased.

*Geo. Miller*, for the appellant. I. William Hubbard, the testator, was, at the time he made the nuncupative will and at the time of his death, a mariner at sea. A mariner is at sea, within the meaning of the statute, if he is absent from home, upon a

sea voyage, although he may be in a river or harbor, when the will is made. (2 *R. S.* 60, § 22.  1 *R. L.* 368, § 17.)  II. The power of soldiers and mariners to make nuncupative wills remains as it was at the common law.  This right has always been reserved to soldiers and mariners by the English and the New-York statutes.  III. The words of the deceased which the appellant claims to be a nuncupative will are the following, viz. " I want my wife to have all my personal property."  This declaration of the deceased was followed by the inquiry whether he wanted his wife to have *all* his property, and he said " yes, all." · The proof shows it to be an absolute certainty, that it was the expressed will of the deceased that his wife should have all his personal property.  IV. That the declarations of the testator were made with the intention to dispose of his personal property to his wife, appears from the following considerations, which show an *animus testandi*, to a moral certainty.  (1.) They were made in view of approaching death.  He sent his last words to his wife, " Tell her I loved her to the end."  (2.) He was asked if he had a will.  He said no, he had had one, but it was destroyed after the death of his son.  (3.) He requested his mate, Mr. Beckwith, to settle his affairs or see to his business.  (4.) He made the declaration on being asked what disposition he wished to make of his property.  (5.) The witnesses all understood it to be a will, and spoke of it as a disposition of his property, in answer to the questions of the counsel of both parties. V. The *rogatio testium*, or calling upon persons to bear witness to the act, was not necessary.  The act enjoining this has no application to soldiers or mariners, and it was not necessary at the common law.  The only question here is, Did the testator, in view of approaching death, declare his wish that his wife should have all his personal property, with the intent that she should have it after he should be dead ?  VI. There appears to be no case in the books relating to the nuncupative will of a sailor or mariner.  The authorities cited below refer to nuncupative wills ; but they all arose under the statute of 29 Charles 2, and we submit that the reasoning in every case would sustain the nuncupative will in question, inasmuch as the statute does

---
Hubbard *v.* Hubbard.
---

not apply. (2 *Chit. Bl.* 501. *Lemunn* v. *Bonsall,* 1 *Addams'*
*R.* 389. *Brogden* v. *Brown,* 2 *Id.* 449. *Dun* v. *Clark,* 3 *Id.* 207.
*Parsons* v. *Miller,* 2 *Phillim.* 194. *Burnet* v. *Jackson,* 2 *Id.* 191.)
That no particular form of publication was necessary at com-
mon law, for a written or unwritten will of personal property, see
2 *Bl. Com.* 501; 4 *Kent,* 516, 518; 2 *Hagg. Eccl. Rep.* 247;
*Gratton* v. *Appleton,* 2 *Stor. Rep.* 755. VII. The question
whether the declaration of the testator which we claim to be his
nuncupative will was made *animo testandi,* is a question of fact,
and not a question of law under sections 96, 97 and 98 of 2 R. S.
608. The judge reversed the decision of the surrogate on this
question, and decided that it was a question of law. He should
have considered it a question of fact, and directed an issue to be
made up to be tried by a jury, pursuant to said 98th section.
This is not a question whether any particular form or solemnity
of publication required by statute has been complied with; but
whether, in the language of Justice Story, it clearly appears that
it was the intention of the testator that his words should operate
after his death and not before. And this depends not alone
upon the legal construction of the words, but upon the time, oc-
casion and circumstances of their utterance. This question was
not seriously raised before the surrogate. The grounds of op-
position there were that the testator was not a mariner at sea,
and that he did not call upon the bystanders to witness that he
made his will.

*S. D. Dayton,* for the respondent. I. A nuncupative, or un-
written will, bequeathing personal estate, is not good, unless
made by a soldier while in actual service, or by a mariner while
at sea. (2 *R. S.* 60, § 22, 1*st ed.*) II. It is a will by word of
mouth; it is a verbal declaration of the testator's mind, before
a sufficient number of witnesses, two at least, (2 *R. S.* 63,)
which, being reduced to writing, after the death of the testator,
is good. III. Such will can only be made while the testator is
at sea, lies languishing, for fear of sudden death, and dare not
stay to have his testament written, being *in extremis.* (*Prince*
v. *Hazleton,* 20 *John.* 502, *and the authorities therein cited.*)

IV. It is an act to be performed at the request of the testator himself, and wherein all the witnesses are called upon, by him, to bear witness as such, of his last will; and where he declares, by words, presently, before them, (2 *Black.* 500, 501,) what his last will is. V. All the witnesses must agree, when they reduce the will to writing, in making the testator speak the same words, and it is not sufficient to state the substance or effect of them; and the will must have all the requisites existing at common law, and all those prescribed by statute, in point of form, substance, and number of witnesses; otherwise it will fail. (*Eq. Cas. Abr.* 404. 2 *Black.* 500, 501. 20 *John.* 502, *and authorities therein cited.*) VI. It is never allowed, unless there is no time or opportunity to reduce the will to writing, or an inability to reduce to writing. They are confined to extreme cases, and upon the plea of necessity. VII. The case at bar has not the train of essential requisites, to support an unwritten will, bequeathing personal estate.

*By the Court,* BROWN, J. The only question in this cause is upon the validity of the unwritten will of William L. Hubbard, referred to in the proceedings. The decree of the surrogate of the county of Suffolk, adjudged the will to be genuine and valid, admitted it to probate, and directed that letters of administration, with such will annexed, should issue to the appellant, Maria J. Hubbard. From this decree, the respondent, Elias Hubbard, appealed to the special term, where the decree of the surrogate was reversed for error of law, and the cause is now before the general term, upon appeal from the last mentioned order or decree. The deceased was the husband of the appellant, and the son of the respondent, and the will relates exclusively to personal property. He was at the time of his death the master of a coasting vessel called the Oregon, employed in the transportation of coal from the city of Philadelphia to one of the eastern ports. On the 5th of July, 1849, at nine o'clock in the forenoon, while the vessel with the cargo on board, was lying wind-bound at the mouth of Delaware bay, under the breakwater, and about a mile distant from the main land, and three miles from

Hubbard *v.* Hubbard.

Lewiston, the nearest settlement, the deceased—then being on board and in command of the vessel—was seized with the Asiatic cholera. The will was made and published while the vessel and the deceased were in this situation, in the presence of four witnesses, between three and four o'clock in the afternoon; and within one hour thereafter, he died. At the place where the vessel lay, the bay between Capes May and Henlopen is eighteen miles wide and the tide ebbs and flows six feet. The witnesses were not contradicted, and the proof made out, very conclusively, the following facts. 1st. The making and publication of the will; and that it was not reduced to writing. 2d. That the deceased was then of sound mind and memory, and not under any degree of restraint. 3d. That he was in his last sickness, and a mariner actually at sea, at the time the will was made and published. The decree made at the special term assumes that all the facts of the case are true; for had the decree of the surrogate been reversed upon a question of fact, it would have been the duty of the court to direct a feigned issue to be made up and tried, pursuant to the provisions of the 57th and 58th sections of the act in regard to "wills and testaments of real and personal property, and the proof of them." (2 *R. S.* 66, 67.)

A will is defined to be "a declaration of the mind, either by word or writing, in disposing of an estate; and to take place after the death of the testator. It is in Latin called *testamentum,* i. e. *testatio mentis,* the witness of a man's mind; and to devise by testament is to speak by a man's will, what his mind is, to have done after his death." (7 *Bac. Ab.* 299, *tit. Wills and Testaments, A.*) Our notions of a will which is to dispose of an estate after the death of the owner, are associated with the idea of a written instrument, subscribed by the person whose estate is to pass, and attested by two or more witnesses. The requisites of writing, of subscribing, and of attesting witnesses, so indispensable to the force and validity of all ordinary wills of the present day, were not always, nor are they now, universally demanded. The common law is an ancient institution having its origin in a remote period of time when learning had few votaries, and the art of writing was comparatively unknown.

It adapted itself to the condition of the people amongst whom it was recognized as the rule of action; and as very few amongst them could write, a will of chattels, by the common law, was good without writing. (*Swinburne on Wills*, 88. 4 *Kent's Com.* 516.) But for the statute, which demands that wills shall be written and executed, published and attested, after a prescribed fashion, such would be the law at this day. Wills are of two sorts. " First, in writing, which is, where the mind of the testator, in his lifetime, by himself, or some other by his appointment, is put in writing : or, secondly, by word, or without writing, which is, where a man is sick, and for fear that death, or want of memory or speech, should surprise him, that he should be prevented, if he staid the writing of his testament, desires his neighbors and friends to bear witness of his last will, and then declares the same presently, by word, before them : and this is called a *nuncupative* or *nuncupatory* will or testament; and this being after his death proved by witnesses, and put in writing by the ordinary, is of as great force for any other thing but land, as where at the first in the life of the testator it is put in writing." (7 *Bac. Ab.* 305, *tit. Wills and Testaments, D.*) Chancellor Kent, in the very learned and elaborate opinion delivered by him in *Prince* v. *Hazleton*, (20 *John.* 502,) declares it to have been the uniform language of the *English* law writers from the time of Henry 8, down to that day, that nuncupative wills were confined to extreme cases and to be justified only upon the plea of necessity. Mr. Blackstone, in the second volume of his commentaries, page 500, after giving the same definition of a nuncupative will, proceeds to say, " But as *nuncupative* wills and codicils (which were formerly more in use than at present, when writing is become more universal) are liable to great impositions and may occasion many perjuries, the statute of frauds, 29 *Car.* 2, *c.* 3, hath laid them under many restrictions." The restrictions to which he alludes, are to be found in the 19th, 20th, 21st and 22d sections, and relate to the number of witnesses—to the kind of sickness, the place where and the circumstances under which, the will might be made—to the manner in which it should be proved, and to the

Hubbard *v.* Hubbard.

period of time after the death of the testator, within which the substance of it should be reduced to writing, and render it valid. The statute had no application, however, to soldiers in service, or mariners at sea; for the 23d section provided, "that any soldier being in actual military service; or any mariner or seaman being at sea, may dispose of his movables, wages, and personal estate, as he or they might have done before the making of this act." Our statute "to reduce the laws concerning wills into one statute," passed February 20th, 1801, (*Kent & Radcliff's Revision, vol.* 1, *p.* 181, *ch.* 9, §§ 14 *and* 15,) copied substantially all the restrictions of the 29 *Car.* 2, upon the making of nuncupative wills; and so did the act concerning wills, passed March 5th, 1813, *Van Ness and Woodworth's Revision, vol.* 1. *p.* 367, *chap.* 23, *sections* 14 *and* 15,) and both contain the provision that soldiers in actual military service, and mariners, or seamen being at sea, might dispose of their personal estates in the same manner as if those acts had not been passed. The two statutes of this state, to which I have referred, have long since ceased to exist; and in their place, we have the act concerning *wills and testaments of real and personal property, and the proof of them.* (2 *R. S.* 56.) The 22d section is in these words : "No nuncupative or unwritten will, bequeathing personal estate, shall be valid, unless made by a soldier while in actual military service, or by a mariner while at sea." In respect to all but these two classes, the right to transmit personal property by means of an unwritten will was first greatly circumscribed, and then taken away altogether. The imminent dangers, the diseases, disasters, and sudden death, which constantly beset soldiers and sailors; the utter inability, oftentimes, to find the time or the means to make a deliberate and written testamentary disposition of their effects, seem, at all times, to have made them a proper exception to the operation of a rule, which the wisdom of later times, has found it expedient, if not absolutely obligatory, to apply to all others. The right however, of a soldier in actual military service or of a mariner at sea, to make an unwritten will, is not an unqualified right which may be exercised under all circumstances. As the making of such wills, can only

be justified upon the plea of necessity, so they will only be tolerated when made *in extremis.*

The testator William L. Hubbard was a mariner actually at sea. The will was made during his last illness, and within an hour of his death, and was sufficiently proved by the witnesses who were present, and has all the characteristics of a good nuncupative will. The decree made at the special term should be reversed and that of the surrogate affirmed, with the costs of the appeals to Maria J. Hubbard, the appellant.

[KINGS GENERAL TERM, October 6, 1851. *Morse, Barculo* and *Brown,* Justices.]